**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MICHAEL EARL SEXTON,
Petitioner-Appellant,

v.

No. 98-9

JAMES B. FRENCH, Warden, Central
Prison, Raleigh, North Carolina,
Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-97-520-5-HC-H)

Argued: September 23, 1998

Decided: December 23, 1998

Before WILKINSON, Chief Judge, and HAMILTON and
MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Hamilton wrote the opinion, in
which Chief Judge Wilkinson and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Irving L. Joyner, Durham, North Carolina, for Appellant.
Valerie Blanche Spalding, Special Deputy Attorney General, NORTH
CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Caro-
lina, for Appellee. **ON BRIEF:** Tracy Hicks Barley, PILLMON-
DAYE & BARLEY, Durham, North Carolina, for Appellant. Michael

F. Easley, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

_____

**OPINION**

HAMILTON, Circuit Judge:

Following a jury trial in the Superior Court for Wake County, North Carolina, Michael Earl Sexton was convicted and sentenced to death for the murder of Kimberly Crews. He now appeals the district court's denial of his petition for writ of habeas corpus. See 28 U.S.C. § 2254.**1** We affirm.

I

A

The facts of this case are set forth in detail in the opinion of the Supreme Court of North Carolina on direct appeal. See State v. Sexton, 444 S.E.2d 879, 885-91 (N.C. 1994). Accordingly, we need only summarize them briefly.

Kimberly Crews (Crews) was a child abuse counselor. Her office was located in the Wake Area Health Education Center, which is part of the Wake County Medical Center (WCMC) in Raleigh, North Carolina.

Shortly before 6:00 p.m. on August 8, 1990, Crews telephoned her

_____

**1** Because Sexton's petition for writ of habeas corpus was filed on July 3, 1997, subsequent to the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214, amendments to § 2254 effected by § 104 of the AEDPA govern the resolution of this appeal. See Green v. French, 143 F.3d 865, 868 (4th Cir. 1998). As to the provisions contained in § 107 of the AEDPA, the state does not maintain that it has satisfied the opt-in requirements of § 107 such that those provisions of the AEDPA apply.

2

husband, Alan Crews, who was at home with their daughter. Crews asked her husband if the family needed anything from the store, and he replied in the negative. Crews then told her husband that she had just finished with her last client and was on her way home.

Kaye Johnson, a prenatal educator at WCMC, telephoned her husband at 5:45 p.m. on August 8, 1990, and told him that she needed to work one more hour. However, when she realized it was raining heavily, Johnson decided to leave and take her work home. As she left WCMC, she walked through several parking lots to Parking Lot 4. As she approached her car, she noticed an open umbrella in good condition in front of the car. The umbrella was lying upside down with water in it. When Johnson got into her car, she looked at the car's clock. It indicated 6:02 p.m.

Robert McCoy, the supervisor of WCMC's laundry, where Sexton was employed, testified that Sexton was at work when he (McCoy) arrived at 2:00 p.m. on August 8, 1990. At 3:30 p.m., when the laundry room shift changed, Sexton was missing. McCoy testified that the next time he saw Sexton was after everybody had punched out. Sexton came running in through the back ramp and was soaking wet. Sexton said to McCoy, "I got to go. I got to go. I was out there fixing my young lady's car and that was the only thing I was out there doing." Sexton left, and his time card indicated that he left at 6:30 p.m.

By 8:00 p.m., Crews had not returned home, and her husband began to worry. Shortly thereafter, her husband telephoned a friend with whom his wife often exercised. The friend said that she and Crews had planned to exercise but changed their minds on account of the stormy weather. Crews' husband next telephoned 911 and was advised to call area hospitals. Crews' husband contacted three local hospitals, but none had admitted Crews. Crews' husband again called 911.

An officer of the Raleigh Police Department arrived and took a brief statement from Crews' husband. The officer was called away to a robbery but soon returned. The officer asked about possible routes used by Crews in driving home from work and then left to begin

3

checking those routes. Later, the officer returned and informed Crews' husband that his wife had not been found.

Shortly after midnight, Ronnie Holloway, a detective from the Raleigh Police Department, found Crews' minivan on Galahad Street. The minivan was 200 yards from a WCMC parking deck. As Holloway approached the minivan, he shined his flashlight into the minivan. At this point, he saw a nude body, later identified as Crews, in the backseat. According to Holloway, Crews "was lying on her back side and her arms were down[,] the left hanging toward to [sic] the floor of the van and the right one was laying[sic] across her body and the legs were spreaded [sic] open."

Several pieces of physical evidence tied Sexton to Crews' murder. Johnny Leonard, latent examiner for the City-County Bureau of Identification, testified that muddy footprints found in the minivan were made by Sexton's shoes. One of Sexton's footprints was lifted from Crews' shoe, which was recovered near the front passenger seat. Scott Worsham, a forensic chemist for the State Bureau of Investigation (SBI), testified that head hair consistent with Sexton's was found on: (1) the carpet around the driver's front seat; (2) the carpet around the passenger's front seat; (3) the driver's seat cushion and seat back; (4) the minivan's middle seat; (5) the minivan's headlining above the backseat and over Crews' head; and (6) Crews' chest or shoulder. Worsham also testified that pubic hair consistent with Sexton's was found on the rear seat underneath Crews, in combings from Crews' pubic area, and on Crews' back. SBI Agent John Wayne Bendure testified that fibers from Sexton's shirt and shorts were found on Crews' dress, and in tapings from Crews' shoulders, arms, chest, back, abdomen, and legs. Bendure also testified that fibers from the seat covers in the minivan were also found on Sexton's clothes. SBI Agent David Spittle testified that swabs taken from Crews' mouth showed the presence of spermatozoa consistent with Sexton's blood type and inconsistent with Alan Crews' blood type. Spittle also testified that vaginal swabs from Crews showed the presence of Sexton's spermatozoa, which was also found on the seat under her buttocks.

Crews' autopsy, performed by Chief Medical Examiner Dr. John Butts, revealed that she died as a result of ligature strangulation, which obstructs the flow of blood to the brain. The autopsy also

4

revealed that Crews' body was battered. Crews had facial injuries, two burn-like ligature marks on her neck, two bruises on the back of her left hand, a deep bruise on one of her forearms, and scrapes on both of her knees and on her right elbow.

Crime scene investigators found Crews' keys, employee parking lot entry card, health club membership card, and other personal items in a water-filled ditch on Old Bunch Road. Crews' pocketbook, portfolio containing books, and her pantyhose were found beside the same road. Nearby, crime scene investigators recovered Crews' umbrella and her checkbook, which was propped against a tree. [2] Sexton assisted the crime scene investigators in recovering many of these items.

The state also introduced evidence that at 6:50 p.m. on the evening of Crews' murder someone withdrew $100 from Crews' checking account by way of an automatic teller machine (ATM) at the Centura Shopping Center on Poole Road in Raleigh. The Centura Shopping Center is approximately two miles from WCMC. Leon Turner testified that he saw Sexton at the Centura Shopping Center ATM at 6:40 p.m.

The state also introduced evidence that at 7:30 p.m. there was a withdrawal request for $200 from Crews' savings account. This request, made from an ATM at the Triangle East Shopping Center in Zebulon, was denied because it exceeded the daily withdrawal limit. In his confession, which was played to the jury, Sexton stated that Crews saw him trying to start his girlfriend's car [3] and offered to give him a ride to the security office at the front of the WCMC. Sexton stated that he asked Crews to drive him to Galahad Street because his

---

[2] At trial, Kaye Johnson testified that the umbrella she saw in front of her car on the night of Crews' murder looked like the one recovered by the crime scene investigators.

[3] Sexton's girlfriend, Angela Perry, testified that Sexton lived with her and her daughter in Plummer's Trailer Park near Old Bunch Road in Zebulon. Perry testified that on August 8, 1990, Sexton drove her car to work. Perry also testified that her car was difficult to start so a screwdriver was kept in the car and was used under the hood when starting the car.

5

cousin's car was there and he could use his cousin's jumper cables to start Perry's car. Sexton also stated that he asked Crews if she wanted to go to the back of the minivan and that, in response, Crews got up and went to the back without saying anything. Sexton said he asked Crews to take off her clothes and she did so. Sexton stated that Crews changed her mind about having sex with him and that he wrapped her pantyhose around her neck and tightened them because she was attempting to scream and get out of the minivan. Sexton further stated that when he left the minivan he thought Crews had passed out and would later wake up. Sexton also denied having sex with Crews.

Sexton's trial testimony was consistent with his confession, except that in his trial testimony Sexton admitted having sex with Crews. Sexton testified the encounter was consensual.

B

On September 10, 1990, a Wake County grand jury indicted Sexton for first-degree murder, first-degree rape, first-degree sexual offense, first-degree kidnapping, and robbery. At his jury trial, Sexton was represented by Thomas Manning and Duncan McMillan. At the conclusion of the trial, Sexton was convicted of all the charges contained in the indictment. In the bifurcated proceeding, the trial court submitted four aggravating circumstances to the jury: (1) the murder was committed for the purpose of avoiding or preventing a lawful arrest, see N.C. Gen. Stat. § 15A-2000(e)(4); (2) the murder was committed while Sexton was engaged in the commission of a robbery, rape, first-degree sexual offense, or kidnapping, see N.C. Gen. Stat. § 15A-2000(e)(5); (3) the murder was committed for pecuniary gain, see N.C. Gen. Stat. § 15A-2000(e)(6); and (4) the murder was especially heinous, atrocious, or cruel, see N.C. Gen. Stat. § 15A-2000(e)(9). The jury found the existence of only three of these aggravating circumstances, declining to find the (e)(6) aggravating circumstance. The jury found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances **4** and recom-

_____

**4** The trial court submitted thirty-two mitigating circumstances and the jury found the existence of the following eighteen: (1) while in prison Sexton maintained meaningful relationships with those close to him; (2)

6

mended that Sexton be sentenced to death. The trial court sentenced Sexton in accordance with the jury's recommendation. **5**

On direct appeal, the North Carolina Supreme Court affirmed Sexton's convictions and sentences. See State v. Sexton, 444 S.E.2d at 913. On November 14, 1994, the United States Supreme Court denied

_____

the meaningful relationships provided Sexton with guidance and positive support; (3) while in prison, Sexton sought to help and advise others; (4) during Sexton's formative years, his mother suffered from alcoholism; (5) Sexton's mother was of limited intelligence and mentally unable to provide for and relate to him in a normal mother-child relationship and abandoned him and his siblings at a young age; (6) because of her problems and limitations, Sexton's mother was unable to provide normal or adequate guidance to Sexton as a child; (7) after she was found to be unfit to care for her children, Sexton's mother abandoned him and his siblings; (8) as a young child and adolescent, Sexton was deprived of the family nurturing necessary and essential for proper and normal development and growth; (9) Sexton is an adult child of a parent who abused alcohol; (10) since Sexton's father died in an automobile accident when Sexton was five years old, Sexton was unable to have a parental relationship with or receive significant guidance from his father; (11) during his formative years, Sexton and his siblings were subjected to physical and emotional abuse by his mother and others who occasionally befriended her; (12) during his formative years, Sexton was subjected to physical abuse by his surrogate father; (13) Sexton's mental and emotional disturbances were caused in part by the emotional instability of his family members during his early developmental stages; (14) after the Department of Social Services (DSS) had to intervene to protect him and his siblings, Sexton lived in a series of residences, including an orphanage and a foster home; (15) from age thirteen, Sexton was separated periodically from his brother and sister, on account of their status as DSS wards, and this caused Sexton much concern; (16) during his formative years, Sexton's mental and emotional disturbances were caused in whole or in part by the instability of his family; (17) Sexton's life has great value to him, his family, and friends; and (18) Sexton could adjust well to the structured environment of life in prison.

**5** In addition, the trial court imposed life sentences on the first-degree rape and first-degree sexual offense convictions, a forty-year sentence for the first-degree kidnapping conviction, and a ten-year sentence for the robbery conviction.

7

Sexton's petition for writ of certiorari. See Sexton v. North Carolina, 513 U.S. 1006 (1994).

On September 15, 1995, Sexton filed a motion for appropriate relief (MAR) in Wake County Superior Court. The MAR contained nineteen claims.[6] On January 9, 1996, Sexton filed an amended MAR

_____

[6] The nineteen claims were: (1) Sexton's Fourth and Fifth Amendment rights were violated when Raleigh police officers interrogated him without first giving him warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966); (2) Raleigh police officers and the SBI withheld exculpatory evidence in violation of Sexton's Sixth and Fourteenth Amendment rights by failing to provide information about hair strands found in Crews' pantyhose; (3) North Carolina's death penalty statute is unconstitutional because the death penalty is applied in a freakish and arbitrary manner; (4) Sexton's trial counsel failed to question jurors about their racial bias; (5) the state presented potentially exculpatory evidence at trial which had not previously been disclosed and Sexton's trial counsel failed to seek a continuance to test this newly discovered evidence or seek sanctions against the state; (6) the trial court committed prejudicial error when it prevented Sexton's trial counsel from questioning a chemist about whether another person may have been in the minivan the night Crews was murdered; (7) Sexton's trial counsel failed to vigorously challenge the testing and significance of hair samples and semen stains, including subjecting such evidence to DNA testing; (8) Sexton's trial counsel forced him to testify against his will even though the state already had introduced into evidence an illegally obtained admission against interest; (9) the state was permitted to question Sexton, without objection, regarding two uncounseled guilty pleas for assault on a female; (10) the trial court erred by denying Sexton's motions to dismiss the charges of first-degree rape, first-degree sexual offense, robbery, and kidnapping; (11) the trial court erred by not requiring the state to elect whether to submit the charge of first-degree murder or felony murder to the jury; (12) African-Americans were systematically excluded from selection as members of the jury; (13) the jury erred in finding three aggravating circumstances; (14) the trial court gave misleading instructions as to the aggravating circumstances; (15) evidence submitted during the sentencing phase of the trial was insufficient to support the jury's sentencing recommendation; (16) the trial court erred when it presented the first-degree murder conviction to the jury for sentencing purposes; (17) the jury erred by failing to find four mitigating factors; (18) Sexton's trial counsel inaccurately portrayed him at sentencing; and (19) Sexton's trial counsel were ineffective in preparing and trying his case.

(AMAR), which essentially added a claim of ineffective assistance of appellate counsel to the nineteen claims alleged in the MAR filed on September 15, 1995.

On February 22, 1996, the state habeas court found that claims (1), (2), (3), (10), (11), (12), (13), (14), (15), (16), and (17) were procedurally barred, finding some of the claims barred because they were decided on direct appeal, see N.C. Gen. Stat. § 15A-1419(a)(2) (providing that a state habeas court may deny a MAR if the "ground or issue underlying the motion was previously determined on the merits upon an appeal from the judgment . . . ."), and others procedurally barred because they could have been raised on direct appeal but were not, see N.C. Gen. Stat. § 15A-1419(a)(3) (providing that a state habeas court may deny a MAR if "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so.").

On March 22, 1996, the state habeas court dismissed claims (5), (6), (7), and (9) on the merits. The state habeas court also found that Sexton's ineffective assistance of appellate counsel claim was procedurally barred and, in any event, without merit.

On September 9, 1996, the state habeas court held a hearing on Sexton's four remaining claims: claim (4), relating to trial counsels' failure to question jurors about their racial bias; claim (8), relating to Sexton's claim that his trial counsel forced him to testify without his consent; claim (18), relating to trial counsels' portrayal of Sexton at sentencing; and claim (19), relating to Sexton's claim that his trial counsel were ineffective in the preparation and trial of his case. On October 15, 1996, the state habeas court denied these remaining claims on the merits.

On July 3, 1997, Sexton filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of North Carolina. The petition contained claims (1) through (19) of the MAR and six additional claims.[7] On February 25, 1998, the district court

_____

[7] The six additional claims were: claim (20), alleging that the state habeas court erred in denying Sexton's motion to amend his AMAR to

9

dismissed Sexton's petition. On March 27, 1998, Sexton filed a notice of appeal and an application for a certificate of appealability in the district court. On April 9, 1998, the district court granted Sexton a certificate of appealability.

II

The AEDPA provides, in relevant part, that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to, or involves an unreasonable application of, clearly established Federal

_____

include a claim of juror misconduct; claim (21), alleging that the state habeas court's dismissal of Sexton's claims denied him due process; claim (22), alleging that the trial court erred by denying Sexton's <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), challenges; claim (23), alleging that the state improperly introduced rebuttal evidence of Crews' character and reputation at trial; claim (24), alleging that the prosecutor made a "grossly improper" closing argument; and claim (25), alleging that the trial court erred when it submitted the "heinous, atrocious, or cruel" aggravating circumstance to the jury and erred when it failed to submit the "no significant history of prior criminal activity" mitigating circumstance to the jury.

law, as determined by the Supreme Court of the United States" if: (1) the state court decision is in "square conflict" with Supreme Court precedent which is controlling as to law and fact; or (2) if no such controlling decision exists, "the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant supreme court precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts." Green, 143 F.3d at 870. "In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." Id.

III

Sexton's most salient argument on appeal is that his trial counsel were constitutionally ineffective because they forced him to testify at trial. According to Sexton, he was never apprised of his right to waive his right to testify and, given the choice, he would not have testified at trial.

In Rock v. Arkansas, 483 U.S. 44 (1987), the Supreme Court held that a defendant's right to testify at his criminal trial, although not found in the text of the Constitution, "has sources in several provisions of the Constitution." Id. at 51. The Court first looked to the Due Process Clause of the Fourteenth Amendment, noting that "the right to be heard, which is so essential to due process in an adversary system of adjudication, [can] be vindicated only by affording a defendant an opportunity to testify before the factfinder." Id. at 51 n.8. The Court next looked to the Compulsory Process Clause of the Sixth Amendment, noting that "[l]ogically included in the accused's right to call witnesses whose testimony is material and favorable to his defense . . . is a right to testify himself, should he decide it is in his favor to do so." Id. at 52 (citation and internal quotation marks omitted). Moreover, the Court recognized that under Faretta v. California, 422 U.S. 806 (1975), the Sixth Amendment includes the right of self-representation, and that "[a] defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness." Rock, 483 U.S. at 52. Finally, the Court looked to the Fifth Amendment's guarantee against compelled testimony and

11

found that the right to testify was "a necessary corollary" to that provision. Id.

Having found the existence of a constitutional right to testify on one's behalf in Rock, the Court has since never resolved the question of whether the right to testify is "personal" and, therefore, can only be waived by the defendant. However, every circuit that has addressed the issue has held that the right to testify is personal and must be waived by the defendant. See Brown v. Artuz, 124 F.3d 73, 77-78 (2d Cir. 1997), cert. denied, 118 S. Ct. 1077 (1998); United States v. Ortiz, 82 F.3d 1066, 1070 (D.C. Cir. 1996); United States v. Pennycooke, 65 F.3d 9, 10-13 (3d Cir. 1995); Jordan v. Hargett, 34 F.3d 310, 312 (5th Cir. 1994), vacated on other grounds, 53 F.3d 94 (5th Cir. 1995) (en banc); United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993); United States v. Teague, 953 F.2d 1528, 1532 (11th Cir. 1992) (en banc); United States v. McMeans, 927 F.2d 162, 163 (4th Cir. 1991); Rogers-Bey v. Lane, 896 F.2d 279, 283 (7th Cir. 1990); United States v. Bernloehr, 833 F.2d 749, 751 (8th Cir. 1987); see also Lema v. United States, 987 F.2d 48, 52 (1st Cir. 1993) (assuming without deciding that right to testify may not be waived by counsel).

The next question that arises is who should bear the burden of ensuring that the defendant is informed of the nature and existence of the right to testify and that any decision to waive this right be knowingly and intelligently made. Some courts, including this one, perhaps unwisely, have concluded that the trial court does not have a sua sponte duty to conduct a colloquy with the defendant at trial to determine whether the defendant has knowingly and intelligently waived the right to testify. See Pennycooke, 65 F.3d at 11; United States v. Brimberry, 961 F.2d 1286, 1289-90 (7th Cir. 1992); Teague, 953 F.2d at 1533 n.8; McMeans, 927 F.2d at 163; United States v. Edwards, 897 F.2d 445, 447 (9th Cir. 1990); Siciliano v. Vose, 834 F.2d 29, 30 (1st Cir. 1987); Bernloehr, 833 F.2d at 752; United States v. Janoe, 720 F.2d 1156, 1161 (10th Cir. 1983). In finding no duty on the trial court, these courts have focused on avoiding interference with the attorney-client relationship and defense strategy, see, e.g., Pennycooke, 65 F.3d at 11; Teague, 953 F.2d at 1533 n.8; Underwood v. Clark, 939 F.2d 473, 476 (7th Cir. 1991); thus, trial counsel, not the court, has the primary responsibility for advising the defendant of

12

his right to testify and for explaining the tactical implications of doing so or not. See, e.g., Teague, 953 F.2d at 1533-34; United States v. Campione, 942 F.2d 429, 439 (7th Cir. 1991). Other courts have expressed concerns about a per se rule requiring a trial court to advise a defendant about his right to testify because such a rule would tend to suggest that the trial court had an opinion on what the defendant should do, potentially disrupting trial strategy, see, e.g., Pennycooke, 65 F.3d at 11; Siciliano, 834 F.2d at 30, and would cause delay, see Underwood, 939 F.2d at 476.**8**

Because the burden of ensuring that a criminal defendant is informed of the nature and existence of the right to testify rests upon trial counsel, the burden shouldered by trial counsel is a component of effective assistance of counsel. See Brown , 124 F.2d at 79. Consequently, a criminal defendant's claim that his trial counsel was constitutionally ineffective because trial counsel failed to inform him of his right to testify or because trial counsel forced him to testify must satisfy the two-prong test established in Strickland v. Washington, 466 U.S. 668 (1984). See Brown, 124 F.2d at 79.

In order to succeed on a claim of ineffective assistance of counsel, a defendant must show: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance was prejudicial. See id. at 687-88. Under the first prong of Strickland, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness under "prevailing professional norms." Id. at 688. In evaluating counsel's performance, we must "indulge a strong presumption that counsel's

_____

**8** Several circuit courts have ruled that although the trial court generally is not required "to advise the defendant of the right to testify or to obtain an on-the-record waiver of such right," Pennycooke, 65 F.3d at 13, "judicial interjection through a direct colloquy with the defendant may be required" in "exceptional, narrowly defined circumstances," id. at 12, for instance, where the trial court has reason to believe that defense counsel is frustrating the defendant's desire to testify, id. at 13, where the defendant has expressed his desire to testify to the court, see Ortega v. O'Leary, 843 F.2d 258, 261 (7th Cir. 1988), or where "there appears to be no rational explanation for the decision" not to testify, Ortiz, 82 F.3d at 1071.

13

conduct falls within the wide range of reasonable professional assistance." Id. at 689. Further, we must not engage in hindsight; rather, we must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. Id. at 690. To satisfy the second prong of Strickland, a defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. However, we cannot grant relief solely because the outcome would have been different absent counsel's deficient performance. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). Instead, we can only grant relief under the second prong of Strickland if the "result of the proceeding was fundamentally unfair or unreliable." Id. at 369.

On state habeas, in rejecting Sexton's claims that he was not apprised of his right to waive his right to testify and that he was forced to testify, the state habeas court made the following findings of fact:

> Defendant's account of the case was that there had been a voluntary or consensual sexual encounter between himself and Ms. Crews, and that following the encounter a dispute arose which led to his strangling Ms. Crews. Therefore, McMillan and the lead defense attorney, Thomas Manning, developed a defense for the guilt/innocence phase of the trial which would, if believed, support a conviction of an offense less than first degree murder. . . .

> McMillan's considerations with regard to defendant's testifying were related in large part to the statement defendant had made to the police. The statement suggested that the sexual encounter had been consensual, but from a trial standpoint, assuming that the statement would be admissible, defendant's account of events had to be more fully developed and explained if defendant was to have any chance at all of a conviction of an offense less than first degree murder. Defendant was the only person who could do that. In the factual context of this case, the consent defense could only be pursued through defendant's own tes-

14

timony. There was no other defense possible in light of defendant's statement to the police. The issue was therefore discussed; and defendant was brought into the courtroom on more than one occasion for practice sessions so he could be acclimated and familiarized with the procedure of testifying.

Defendant did not express any reluctance or resistance to testifying. McMillan and Manning talked with defendant about the necessity of his testifying, and explained that the only chance for defendant's account of events to be believed would have to be based on his testimony. McMillan felt at the time that defendant understood that his account was necessary to explain the circumstances in such a fashion that his acts would not constitute first degree murder. After the practice sessions, McMillan did not feel that defendant had done so badly that the attorneys should advise him not to take the stand. . . .

Manning confirmed that he and McMillan had discussed the matter of the necessity of testifying with defendant. . . . Manning explained to defendant that the only chance of acquittal on first degree murder was to produce evidence of consent and to explain the escalation of the physical contact that had taken place in Ms. Crews' van.

The first time Manning saw defendant, defendant gave him his version of events, and this was the same version to which he testified at trial. Manning had already determined that the taped confession to police would be admissible at trial, since defendant had waived his rights in a valid manner and without coercion told the police the truth as he knew it. The attorneys decided therefore to try for voluntary manslaughter and hoped for a verdict of second degree murder . . . .

Defendant did not indicate any reluctance to testify: Manning thought that defendant was always afraid to testify; . . . but he never told either of the attorneys that he did not want to testify. Although Manning was aware of defendant's limitations, Manning did not feel that the attorneys were over-

15

bearing defendant's will as to testifying. Manning never got the feeling that defendant did not want to testify.

Because of defendant's apprehension, the attorneys had him brought into the courtroom for rehearsals, so that they could help him. There was one long session and one shorter one. They discussed strategy for testifying with defendant and then practiced direct and cross-examination. . . . The attorneys . . . felt that defendant's sincerity would become apparent to the jury as he testified. Manning believed this as a tactical and strategic matter.

While Sexton's claim that he was forced to testify has a hollow ring in light of the state habeas court's findings that he did not express any reluctance or resistance to testifying and that his trial counsel explained, and he understood, that he needed to testify if his account of the encounter was going to be accepted by the jury, his allegation that he was never apprised of his right to waive his right to testify or that the decision to testify ultimately rested with him has some support. The state court record does not indicate that Sexton was apprised of his right to waive his right to testify or that the decision to testify was his. However, we need not decide whether Sexton's allegations that his trial counsel never advised him of his right to waive his right to testify and that the decision to testify was his satisfy Strickland's performance prong because, even assuming they do, Sexton cannot establish prejudice under Strickland.

To satisfy Strickland's prejudice prong, Sexton has to show that the result of his trial was "fundamentally unfair or unreliable." Lockhart, 506 U.S. at 369. Sexton cannot meet this burden because his testimony at trial only helped his case, as it was consistent with his confession that was previously admitted into evidence. Sexton claims that the result of his trial is unreliable because his trial strategy differed substantially from trial counsels' strategy. According to Sexton, he would have successfully moved to suppress his confession and would have decided not to testify, leaving the state to depend on the strength of its remaining case. However, even if Sexton's confession and trial testimony were not admitted, the result of the proceeding is not fundamentally unfair or unreliable.

16

Absent Sexton's confession and trial testimony, the state's evidence demonstrated that Sexton's footprint was lifted from Crews' shoe and head hair consistent with Sexton's was found on: (1) the carpet around the driver's front seat; (2) the carpet around the passenger's front seat; (3) the driver's seat cushion and seat back; (4) the minivan's middle seat; (5) the minivan's headlining above the backseat and over Crews' head; and (6) Crews' chest or shoulder. Pubic hair consistent with Sexton's was found on the rear seat underneath Crews, in combings from Crews' pubic area, and on Crews' back. Further, fibers from Sexton's shirt and shorts were found on Crews' dress, and in tapings from Crews' shoulders, arms, chest, back, abdomen, and legs. Fibers from the seat covers in the minivan were also found on Sexton's clothes. Swabs taken from Crews' mouth showed the presence of spermatozoa consistent with Sexton's blood type. Vaginal swabs from Crews showed the presence of Sexton's spermatozoa, which was also found on the seat under her buttocks.

Moreover, the encounter was obviously nonconsensual. Crews' autopsy revealed that she died as a result of ligature strangulation. The autopsy also revealed that Crews' body was severely battered; Crews had facial injuries, two burn-like ligature marks on her neck, two bruises on the back of her left hand, a deep bruise on one of her forearms, and scrapes on both of her knees and on her right elbow.

Furthermore, crime scene investigators found Crews' keys, employee parking lot entry card, health club membership card, and other personal items in a water-filled ditch on a road near the trailer park where Sexton lived. Crews' pocketbook, portfolio containing books, and her pantyhose were found beside the same road. Nearby, crime scene investigators recovered Crews' umbrella, which, based on the testimony of Kaye Johnson, Sexton retrieved after he abducted Crews.

Finally, the state also introduced evidence that Sexton withdrew $100 from Crews' checking account by way of an ATM at the Centura Shopping Center at 6:50 p.m. on August 8, 1990. Leon Turner testified that he saw Sexton at the Centura Shopping Center ATM ten minutes before the withdrawal.

In summary, the admission of Sexton's confession and testimony at trial in no way rendered the result of Sexton's trial unreliable. Cf.

17

Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en banc) (holding that admission of a defendant's lengthy, detailed, and tape-recorded confession, which was recognized as determinative of the verdict by the trial court and provided most of the basis of the prosecutor's closing argument, did not have a substantial and injurious effect or influence in determining the jury's verdict in light of two short and poorly recollected prior confessions and certain circumstantial evidence), cert. denied, 118 S. Ct. 83 (1997). In fact, in our view, the admission of Sexton's confession and testimony at trial served to help his case. The only plausible defense for Sexton, in view of the overwhelming evidence that Sexton kidnapped, raped, murdered, and robbed Crews was a defense based on consent. The consent defense was fully developed at trial, but the jury simply rejected it. Without such a defense, Sexton's fate was a foregone conclusion. In short, Sexton has failed to demonstrate that the result of his trial was fundamentally unfair or unreliable and, therefore, has failed to prove that the state court's application of Strickland was unreasonable.

IV

Sexton raises several other claims of ineffective assistance of counsel. We shall address each of these arguments in turn.

A

First, Sexton claims that his trial counsel were constitutionally ineffective because they failed to secure his consent not to challenge the admissibility of his confession.[9] This argument is without merit.

_____

[9] Notably, Sexton does not contend that his trial counsels' decision not to move to suppress his confession was an unsound trial strategy; rather, he challenges his trial counsels' decision not to move to suppress his confession on the basis that it was done without his consent and, given the choice, he would have challenged the admissibility of the confession. Nevertheless, we note that trial counsels' decision not to challenge the admissibility of Sexton's confession was manifestly a reasonable one. As the North Carolina Supreme Court explained on direct appeal:

> In the instant case, defendant's defense to the charges of kidnapping, rape, and sexual offense was consent. The statement to

18

There are essentially two categories of decisions made by a criminal defendant's trial counsel: those decisions, deemed "personal," that must be made with the defendant's consent and those that may be made without the defendant's consent. See Brown , 124 F.3d at 77. Decisions that may be made without the defendant's consent "primarily involve trial strategy and tactics," such as "what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed." Teague, 953 F.2d at 1531. The decisions that must be made with the defendant's consent include the decision to enter a guilty plea, see Boykin v. Alabama, 395 U.S. 238, 242-44 (1969), the decision to waive a jury trial, see Adams v. United States ex rel. McCann , 317 U.S. 269, 275 (1942), the decision to pursue an appeal, see Fay v. Noia, 372 U.S. 391, 438-40 (1963), and, as noted in Part III of this opinion, the decision to testify at trial.

---

> Detective Howard, if believed, tended to bolster defendant's trial testimony that the victim found him attractive, consented to accompany and have sex with him, and later changed her mind. The defense of consent tended further to defeat a conviction of murder on the basis of felony murder.
>
> In addition, defendant's defense to the charge of first-degree murder was lack of specific intent to kill formed after premeditation and deliberation. The statement to Detective Howard tended to bolster defendant's trial testimony that after the victim changed her mind, everything happened very fast; he thought the victim was alive when he left her; and on the next day he was shocked to find out she was dead. At trial defendant explained that after he learned of the victim's death, he knew he was in trouble. Fearing he would get into more trouble, he did not tell Howard about having consensual sex with her.
>
> Defendant's credibility was an essential element of his defenses. Evidence that prior to trial he made a statement consistent with the defenses raised at trial tended to bolster his credibility, and, consequently, his defenses. Defendant also gained advantage from having his explanation of the events put before the jury during State's case in chief.

State v. Sexton, 444 S.E.2d at 895-96.

19

The decision whether to file a pre-trial motion to suppress a confession is a classic tactical decision. Trial counsel has superior experience with the criminal process and detailed, objective knowledge of the strengths and weaknesses of the defendant's case. Trial counsel also is in a far better position to assess the meritoriousness of a pre-trial motion to suppress a confession. We hold that trial counsels' decision not to file a pre-trial motion to suppress Sexton's confession was binding on Sexton and, therefore, trial counsel were not constitutionally ineffective for allegedly failing to secure Sexton's consent. Accordingly, the state court's application of <u>Strickland</u> to this claim was not unreasonable.

B

Next, Sexton contends that his trial counsel were constitutionally ineffective because they failed to apprise him of his right to personally participate in <u>voir dire</u>, failed to secure his consent not to raise the issue of racial bias during <u>voir dire</u>, and failed to raise the issue of racial bias on <u>voir dire</u>. These arguments are without merit.

First, there is no support for Sexton's argument that he was not apprised of his right to personally participate in <u>voir dire</u>. On state habeas, the state habeas court made a specific finding that "[a]t the conclusion of questioning of each juror, the attorneys consulted with the defendant as to whether to accept or challenge the juror." Further, the transcript of the hearing on state habeas demonstrates that trial counsel discussed areas of inquiry for the jurors with Sexton and that at the conclusion of questioning of each juror they made a decision with Sexton's input as to whether to challenge or pass that juror. As one of Sexton's trial counsel noted during his testimony on state habeas:

> During jury selection, we asked [Sexton] to focus on the people we were talking to, because we were going to be asking his opinions about what he thought about their responses, and in that process any input from either counsel or defendant about what their gut feeling is about a particular juror is important. And we certainly consulted with him, in every decision we made he was a part of.

20

Second, Sexton claims that his trial counsel were constitutionally ineffective because they failed to secure his consent not to raise the issue of racial bias during voir dire. Although the Supreme Court held in Turner v. Murray, 476 U.S. 28 (1986), that "a capital defendant accused of an interracial capital crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias," id. at 36-37, the Court noted that a defendant may not complain about the failure to question prospective jurors on racial bias unless he has specifically requested such an inquiry. See id. The Court made clear that the decision to question prospective jurors about racial bias is best left in the hands of trial counsel. See id.; see also Spencer v. Murray, 18 F.3d 229, 234 n.6 (4th Cir. 1994). In light of Turner, we believe that Sexton's trial counsels' decision not to question prospective jurors about racial bias was binding on Sexton and, therefore, trial counsel were not constitutionally ineffective for allegedly failing to secure Sexton's consent.

Third, there is no merit to Sexton's argument that his trial counsel were constitutionally ineffective because they failed to raise the issue of racial bias on voir dire. On state habeas, in rejecting this claim, the state court made the following findings of fact:

> McMillan and Manning discussed with defendant the fact that there was a racial factor involved in the case insofar as defendant is black and Ms. Crews was white. . . . McMillan did not consider the murder to be a racial killing per se. . . .
>
> McMillan did not develop any strategy particular to this case in dealing with the racial factor during jury voir dire. He did what he does in any case: he tried to get an idea of what a particular juror's views might be toward such a factor. . . . At the conclusion of questioning of each juror, the attorneys consulted with defendant as to whether to accept or challenge the juror. Defendant participated in these discussions. He never asked the attorneys to question the jurors about any racial animosities they might have been harboring. . . .
>
> McMillan did not notice any overt indications of racial attitudes in the jurors selected for the panel. McMillan did not

21

ask specific questions of the jurors about racial attitudes since he did not wish to irritate them. McMillan normally does not ask questions of jurors about their racial attitudes, and particularly in this case since such questioning creates a great risk of polarizing them, especially when voir dire proceeds in group fashion. . . .

The racial sensitivity of the case was a factor in Manning's thinking about defendant's defense; but Manning did not significantly dwell upon it. Because of defendant's account of a consensual sexual encounter, Manning did not view the case as particularly racially charged. In Manning's judgment, the facts of the case would control the outcome, not race. The racial difference between defendant and Ms. Crews would not be a factor if the jury accepted defendant's version of events. Manning felt that if the defense could get one or more black jurors on the panel, then any racial problem that might arise would be controlled by those jurors. . . .

There was one black juror on the chosen panel. Manning had discussed with defendant in general terms what sort of juror they hoped for. Manning did not ask direct questions of the jurors about racial attitudes since in his judgment, the facts of the case and the way the attorneys planned to present the case did not make race a material issue . ... . Defendant took part in all of the decisions on whether to pass or strike a juror.

As noted above in the state habeas court's findings, Sexton's trial counsel considered the issue of racial bias and decided that under the facts of the case, the case was not particularly racially charged, especially because Sexton maintained his encounter with Crews as consensual. Sexton's trial counsel made a tactical decision not to irritate or polarize prospective members of the jury. Obviously, this tactical decision made by Sexton's trial counsel cannot be second-guessed by this court and, therefore, Sexton's trial counsel were not constitutionally ineffective for failing to question prospective jurors about racial bias on voir dire. See Spencer, 18 F.3d at 234.

In summary, the state court's application of Strickland to Sexton's claims that his trial counsel were constitutionally ineffective because

22

they failed to apprise him of his right to personally participate in <u>voir dire</u>, failed to secure his consent not to raise the issue of racial bias during <u>voir dire</u>, and failed to raise the issue of racial bias on <u>voir dire</u> was not unreasonable.

C

Sexton claims that his trial counsel were constitutionally ineffective because they failed to secure his consent to present certain mitigating evidence. Sexton further claims that his trial counsel were constitutionally ineffective because they portrayed him as the product of a severely dysfunctional upbringing. According to Sexton, this strategy "deliberately painted a negative, violence-prone profile of [him] and was not designed to endear [him] to the jury or explain his state of mind when the killing occurred." Petitioner's Brief at 42. Each of these arguments is without merit.

The decision concerning what evidence should be introduced in a capital sentencing is best left in the hands of trial counsel, and reasonable tactical decisions by trial counsel in this regard are binding on the defendant. <u>See Brown v. Dixon</u>, 891 F.2d 490, 499-500 (4th Cir. 1989) (no error in trial counsel's concession of defendant's guilt and two aggravating factors at sentencing phase without consultation with the defendant). Accordingly, trial counsels' alleged failure to secure Sexton's consent to present certain mitigating evidence at sentencing does not render trial counsels' performance constitutionally ineffective.

Second, there is no merit to Sexton's contention that his trial counsel were constitutionally ineffective because they portrayed him at sentencing as the product of a severely dysfunctional upbringing.

On state habeas, in rejecting this claim, the state habeas court made the following findings of fact:

> The sentencing phase defense was based on exploring and developing defendant's family background and socio-economic upbringing, including contacting personnel at the orphanage defendant had attended as well as his support

23

family, his siblings, and personnel in the mental health and social services departments who had had contact with defendant during his minority. . . .

McMillan directed the sentencing phase testimony on defendant's behalf. The defense called Thomas Brown, M.D. and Brad Fisher, Ph.D. to testify in order to present some expert explanation of defendant's relative degree of culpability and responsibility as it related to sentencing. The attorneys hoped that the experts could explain to the jury that a person who is subjected to the type of upbringing defendant suffered is a product of that upbringing and not a voluntarily wicked, evil person. The experts told the attorneys that a person whose control mechanisms were deficient would be subject to snapping uncontrollably under stress.

McMillan and Manning explained to defendant that what they wanted to do at sentencing was to present evidence of his life history with an explanation by medical professionals as to what impact such life history would have had upon defendant. The theme of sentencing was that too little had been done for defendant too late. The attorneys were careful to try to keep defendant abreast of what was going on at each step of the proceedings.

Investigation revealed that since defendant had aged out of the DSS system and left his foster family's home, he had managed to find employment and maintain a household. Any stability, however, did not eliminate the problems from which defendant suffered. He had assaulted his girlfriend twice during that period. McMillan felt that presenting defendant in a positive light would have made his acts more reprehensible than presenting him as the product of a dysfunctional upbringing. . . .

Manning got funds from the court for a psychologist and a psychiatrist. Manning has worked with Brad Fisher, Ph.D. for years. Fisher saw Sexton four or five times. Manning was looking for an affirmative defense, perhaps diminished

24

capacity for the guilt/innocence phase of the trial or some mitigating evidence for the penalty phase . . . .

Manning's opinion that defendant was ready to break at any point coincides with the psychological profile; there was also a great deal of DSS material, among which there was evidence of defendant's assaultive behavior.

Thomas Brown, M.D., the psychiatrist, thought defendant was prone to greater violence than Manning thought he was or could be. The basis for Brown's opinion was defendant's poor intellectual functioning and poor impulse control; when stress was added, defendant's behavior would be unpredictable and possibly violent. . . .

The attorneys downplayed the years after defendant had aged out of the state system and prior to the murder because of the two assaults defendant had committed on his girl-friend. They knew if they presented evidence of those years at sentencing, the prosecutor would bring the girlfriend in on rebuttal. Manning and McMillan had decided not to call her since she would not have been a good witness with respect to defendant's propensity for violence. One of the assaults defendant had committed on her included an attempt to strangle her, and there was strangulation in the murder for which defendant was on trial. The girlfriend had said she was scared of defendant and was glad he was not living with her anymore. Rather, the attorneys wanted the jury to see that defendant was damaged and for that reason they should not recommend the death penalty. . . .

In our view, Sexton's trial counsel cannot be faulted under Strickland for presenting Sexton at sentencing as the product of a severely dysfunctional upbringing. Obviously, this was a reasonable trial strategy and cannot be second-guessed by this court. Accordingly, because trial counsels' performance at sentencing was constitutionally effective, the state court's application of Strickland was not unreasonable.

25

V

On direct appeal, Sexton claimed that "[t]he North Carolina death penalty statute, and consequently the death sentence in this case, are unconstitutional." State v. Sexton, 444 S.E.2d at 910. The North Carolina Supreme Court rejected this contention, noting that it had considered Sexton's argument but found no compelling reasons for departing from its existing precedent upholding the constitutionality of North Carolina's death penalty statute. Id.

Sexton's argument is that North Carolina's death penalty statute is unconstitutional because whether a defendant is sentenced to death depends upon the place of indictment and trial--and his color. To support the argument in the North Carolina Supreme Court in his petition for writ of certiorari, Sexton produced the paperwork from a trial in Fayetteville, North Carolina (murder of two blacks by a white soldier). In the district court, Sexton produced the affidavit of James E. Williams, Jr., the public defender in both Orange and Chatham County, North Carolina. In his affidavit, Williams, Jr. states that defendants rarely receive death sentences in both Orange and Chatham County, North Carolina. Apart from the fact that this affidavit was never presented in state court, the paperwork from the trial in Fayetteville, North Carolina, and the affidavit do not demonstrate that the North Carolina Supreme Court's adverse adjudication of this claim was an unreasonable application of McCleskey v. Kemp, 481 U.S. 279 (1987). In McCleskey, the Court set forth very exacting standards for entitlement to constitutional relief based on statistical evidence of race-of-defendant and race-of-victim effects and rejected such a claim based upon the Baldus study.10 Id. at 291-319. Because

_____

10 The Baldus study accounted for 230 variables that could have explained the disparities on nonracial grounds and demonstrated that in over 2,000 murder cases in Georgia during the 1970's, defendants charged with killing white persons received the death penalty in eleven percent of the cases while those charged with killing blacks were sentenced to death in only one percent of the cases. The death penalty was assessed in twenty-two percent (and sought in seventy percent) of the cases involving black defendants and white victims, assessed in eight percent (and sought in thirty-two percent) of the cases involving white defendants and white victims, assessed in three percent (and sought in

26

the McCleskey Court refused to infer discriminatory intent from statistical evidence that was more detailed and developed than the evidence presented by Sexton, the North Carolina Supreme Court's application of McCleskey was not unreasonable.

VI

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED

_____
nineteen percent) of the cases involving white defendants and black victims, and assessed in one percent (and sought in fifteen percent) of the cases involving black defendants and black victims. In sum, in Georgia during the 1970's, black defendants who murdered white victims had a statistically significantly greater chance of being subject to death penalty proceedings and of receiving the death penalty than any other persons. See McCleskey, 481 U.S. at 286-87.

27