332 F.3d 229
 William Henry BELL, Petitioner-Appellant,
v.
Jon E. OZMINT, Director, South Carolina Department of Corrections; Henry Dargan MCMASTER, Attorney General, State of South Carolina, Respondents-Appellees.
 No. 02-21.
 United States Court of Appeals, Fourth Circuit.
 Argued: May 7, 2003.
 Decided: June 12, 2003.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Mark Evan Olive, Law Offices Of Mark E. Olive, P.A., Tallahassee, Florida, for Appellant. Donald John Zelenka, Assistant Deputy Attorney General, Columbia, South Carolina, for Appellees. ON BRIEF: Diana L. Holt, Diana Holt, L.L.C., Columbia, South Carolina, for Appellant.
 Before WILKINS, Chief Judge, and WILKINSON and MOTZ, Circuit Judges.
 Affirmed by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Chief Judge WILKINS and Judge WILKINSON joined.
 OPINION
 DIANA GRIBBON MOTZ, Circuit Judge:
 
 
 1
 A South Carolina jury convicted William Henry Bell of the armed robbery and murder of Dennis Hepler. On the jury's recommendation, the state trial court sentenced Bell to death. After exhausting his state remedies, Bell filed a petition for federal habeas relief, challenging his convictions and death sentence on numerous grounds. The district court denied habeas relief, but granted a certificate of appealability on all claims. Finding no error, we affirm the denial of federal habeas relief.
 
 I.
 
 2
 On direct appeal, the Supreme Court of South Carolina upheld Bell's conviction and sentence. See State v. Bell, 305 S.C. 11, 406 S.E.2d 165 (1991). In doing so, that court described the facts of this case as follows:
 
 
 3
 The victim in this case, Dennis Hepler, was the principal of West Franklin Street Elementary School in Anderson, South Carolina. His body was found outside the school around 1:00 o'clock a.m. on September 1, 1988. He had been shot twice with a .25 caliber pistol, once in the back and once in the back of the head. Appellant's fingerprints were found on the victim's red car which was parked on the street in front of the school. Two witnesses from a nearby apartment complex placed appellant in the area between 10:00 and 11:00 o'clock p.m. on August 31 with John Glen and Kevin Young.
 
 
 4
 Appellant was arrested on the night of September 1. That night, he gave police officers the first of four statements in which he denied ever having been at the West Franklin Street School. On September 3, appellant asked a guard at the detention center to contact the arresting officers. Appellant then gave a second statement. He stated he was walking near the school with John Glen and Kevin Young. Appellant stopped to talk with a girl. When he rejoined his friends, John Glen was inside a red car that was parked in front of the school and was trying to remove a cassette player. At Glen's request, appellant held the car door open. A man came out of the school and shouted at them. Kevin Young stepped from behind a wall in front of the school and shot the man in the back. While appellant and Glen ran from the scene, they heard a second gunshot. When Young caught up with them, the three obtained a ride with a fourth youth. Young still had the gun. The next day, Young threw the gun into some bushes in front of his house.
 
 
 5
 On September 4, appellant gave two more statements. First, he told police officers that he, Young, and Glen were walking on the school grounds on the night of August 31. Appellant and Glen attempted unsuccessfully to get the cassette player out of the car. They heard the sound of a door opening and joined Young behind a wall near the school building. Young said, "The man probably has a wallet." When a man came out of the school, Young moved behind him and told him to relinquish his wallet. The victim complied and Young shot him in the back. The gun jammed. The victim begged them not to shoot him again. Young shot again. The three fled the scene and obtained a ride with a fourth youth. They split $67.00 from the wallet, $20.00 for each of the three and $7.00 for the driver of the car, and threw the wallet out of the car.
 
 
 6
 Finally, appellant gave a fourth statement essentially identical to the third except that it states he took the gun from Young after it jammed, unjammed it, and shot the victim himself. All four statements were admitted into evidence after an extensive Jackson v. Denno hearing. Appellant did not testify at either phase of the trial.
 
 
 7
 Id. at 167-68 (footnote omitted).
 
 
 8
 After the Supreme Court of the United States denied Bell's petition for a writ of certiorari, Bell v. South Carolina, 502 U.S. 1038, 112 S.Ct. 888, 116 L.Ed.2d 791 (1992), Bell filed an application for state post-conviction relief. The state post-conviction (PCR) court permitted discovery and held an evidentiary hearing but denied relief in a lengthy written order. The Supreme Court of South Carolina denied review.
 
 
 9
 Bell then petitioned the district court for federal habeas relief, challenging his convictions and sentence on twenty-seven grounds. A magistrate judge issued a report and recommendation, finding all claims either procedurally barred or without merit. The district court, after conducting a de novo review and correcting certain legal errors, issued a comprehensive, eighty-seven-page opinion denying all federal habeas relief. Bell applied for a certificate of appealability on all claims presented in his petition, which the district court granted. See 28 U.S.C.A. § 2253(c) (West 1994 & Supp.2003).
 
 
 10
 On appeal, Bell raises numerous challenges to his convictions and sentence. He argues that the state court erred in denying him an evidentiary hearing on two different juror partiality claims. Bell also maintains that the State unlawfully based its decision to seek the death penalty on his race and the race of his victim. He similarly asserts that the prosecutor peremptorily struck a potential African-American juror because of her race. Additionally, Bell contends that he was denied effective assistance of trial counsel because of his lawyer's failure to request a certain jury instruction. Finally, Bell asserts that the district court applied an incorrect standard of review in evaluating his claims. We consider each of these arguments, beginning with the challenge to the standard of review.[1]
 
 II.
 
 11
 We conduct de novo review of a "district court's decision on a petition for writ of habeas corpus based on a state court record." Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 555 (4th Cir.1999). Under 28 U.S.C.A. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal court may grant an application for habeas relief on a claim that has been previously adjudicated on the merits in state court only if that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The Supreme Court has directed that "[u]nder § 2254(d)(1)'s `unreasonable application' clause ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Bell contends that the district court erred in choosing to apply § 2254(d)'s deferential standard of review, and that "this case must be remanded to the district court for a de novo review of the facts and law with respect to every claim for relief." Brief of Appellant at 38 (footnote omitted). Bell bases his claim on the fact that the state PCR court, after receiving post-hearing briefs, invited proposed findings of fact and conclusions of law from both parties; it received none from Bell and largely adopted the State's proposed memorandum and order. In response to Bell's post-judgment challenge to this procedure, the state PCR court noted that the "proposed Order was examined line by line and considered with the entire record" but acknowledged that "a substantial portion of [the State's] proposed Order was adopted by the Court," explaining that this was "due to [the States's] cogent reasoning and thorough treatment of the issues."
 
 
 12
 Although we do not applaud this practice, circuit precedent dictates that it does not provide any basis for applying de novo review. Indeed, we recently rejected precisely this claim by Kevin Young, one of Bell's co-perpetrators. See Young v. Catoe, 205 F.3d 750, 755 n. 2 (4th Cir.2000). Young "maintain[ed] that the standard of review mandated by the AEDPA amendments should not govern his ineffective assistance claim, inasmuch as the PCR Court's Order of Dismissal adopted almost verbatim the state's legal memorandum" which "evidences the lack of a considered `decision' within the meaning of Paragraphs (1) and (2) of § 2254(d)." Id. In rejecting Young's claim, we held that the "disposition of a petitioner's constitutional claims in such a manner is unquestionably an `adjudication' by the state court. If that court addresses the merits of the petitioner's claim, then § 2254(d) must be applied." Id. (citations omitted).
 
 
 13
 Recognizing Young's force here, Bell attempts to distinguish the case. He asserts that "Young primarily involved a challenge under 2254(d)(1), with Young claiming that the signing of a party's proposed order" was not an adjudication while in Bell's case "2254(d)(2) is implicated, not just (d)(1)" and § 2254(d)(2) "requires factfinding that is reliable and reasonable." Brief of Appellant at 43. The distinction fails. As the district court noted, in Young we stated that the petitioner was proceeding under both prongs of § 2254 and did not differentiate between those prongs in rejecting his argument. Young, 205 F.3d at 755 n. 2. In sum, Young forecloses Bell's de novo standard of review argument. Thus, the district court correctly applied § 2254's deferential standard of review to Bell's claims, as will we.
 
 III.
 
 14
 Bell argues that his Sixth Amendment right to an impartial and competent jury was violated because, during the evening, the sequestered jurors consumed alcohol and "part[ied]" with the South Carolina Law Enforcement Division (SLED) officers, who guarded the jury (but did not testify at trial), which "lessened [the jury's] sense of responsibility." Brief of Appellant at 9. Bell contends that he is entitled to an evidentiary hearing on these claims.
 
 
 15
 After the trial, SLED conducted an investigation and issued a report on these allegations. Bell moved for a new trial based on this report. The Supreme Court of South Carolina denied the motion. The state PCR court, however, permitted Bell to attempt to secure substantiation of these allegations by taking limited depositions of jurors and alternates. Bell deposed and produced affidavits from multiple jurors, as well as SLED officers, a patron at the hotel bar, and a defense investigator. The discovery indicated that, while the sequestered jurors and SLED officers may have consumed alcohol together at the hotel during the evenings after trial days, SLED officers did not influence or attempt to influence the verdict in any way.
 
 
 16
 For example, alternate juror Bobbie Sue Smith, who made the majority of the allegations, initially stated that some jurors drank excessively during the evenings and that she suspected another alternate juror (who did not deliberate) was having an affair with a SLED officer. However, Ms. Smith later admitted (in one of many discrepancies between her affidavit and deposition testimony) that she did not know if the two "had sexual relations so the word affair then may very well need to be taken off." Ms. Smith also later acknowledged that none of the jurors "appear[ed] to be under the influence of alcoholic beverages" when they left the hotel in the morning to go to court. Another juror stated that jurors drank during meals and in the evening but "[n]o one, however, was incapacitated or incompetent to be a juror because of drinking." Still another juror, Donald Brock, testified that SLED agents did not purchase alcohol for jurors, although they would bring in alcohol brought by family members to the hotel parking lot for jurors to drink in the evenings. He stated that the SLED officer identified by Ms. Smith acted "professional[ly]," and that he did not suspect or have any information that the officer was romantically involved with any juror.
 
 
 17
 The parties also deposed James Smith, a hotel bar patron, who had telephoned Bell's defense counsel after the trial and reported that he had observed jurors drinking in the hotel. Smith was in the hotel bar during two nights of the jury sequestration. He testified that he observed a person he believed to be a juror purchasing and consuming an excessive amount of alcohol at the bar. He also related that he had glanced a couple of times for "maybe five seconds" into a room that he thought contained jurors, who were drinking. In addition, Bell proffered that the hotel bartender would testify to "things very similar to Mr. Smith," that is that jurors came in and obtained "drinks on various nights, several nights, three trays with 10 to 12 drinks per tray, and would then take it back to the day room." Finally, a defense investigator authored a hearsay affidavit relating asserted post-verdict interviews with various jurors. None of those hearsay statements indicated that SLED agents attempted to talk to the jurors about the case prior to or during jury deliberations.
 
 
 18
 After discovery, the State filed a motion in limine to exclude the deposition testimony of all jurors. The state PCR court held a hearing, at which it found that before it could "go behind a jury's verdict[,]" "there has to be strong and clear evidence that jurors were corrupted in some fashion." Failing to find such evidence, the court concluded that the "further testimony of any juror as subpoenaed would be held inadmissible under Rule 606-B of the South Carolina Rules of Civil Procedure [Evidence]." The court also excluded the testimony of bar patron Smith and the hotel bartender because of the lack of any suggestion in that testimony that alcohol affected jury deliberations.[2]
 
 
 19
 The state PCR court's order, made pursuant to South Carolina Rule of Evidence 606(b), which is identical to the federal rule, was not contrary to clearly established federal law. Federal Rule of Evidence 606(b) prohibits juror testimony regarding "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes" but permits juror testimony "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."
 
 
 20
 In Tanner v. United States, 483 U.S. 107, 116, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), the Supreme Court construed Rule 606(b) in considering a defendant's argument that a trial court erred "in not ordering an additional hearing at which jurors would testify concerning drug and alcohol use during the trial." Unlike this case, in Tanner, the jurors allegedly used drugs and "consumed alcohol during the lunch breaks at various times throughout the trial, causing them to sleep through the afternoons." Id. at 113, 107 S.Ct. 2739. The Supreme Court held that, under Rule 606(b), "juror intoxication is not an `outside influence' about which jurors may testify to impeach their verdict." Id. at 125, 107 S.Ct. 2739.[3] Under Tanner, the juror testimony offered by Bell — that jurors consumed alcohol during the evening hours at the hotel, possibly with the assistance of and in the company of non-witness SLED officers — is clearly inadmissible. Indeed, Tanner held that much more serious allegations of juror drinking during trial lunch breaks and drug use during the trial did not render juror testimony admissible.
 
 
 21
 Although Bell also proffered evidence of juror alcohol consumption from nonjurors (the hotel bar patron and bartender) — evidence permitted under Tanner, 483 U.S. at 127, 107 S.Ct. 2739 — the state PCR court reasonably found this evidence did not indicate any outside influence on the jury verdict. Importantly, Bell has produced no evidence that SLED officers attempted to influence the verdict in this case at any time prior to or during deliberations. Thus, the state PCR court's decision was not contrary to clearly established federal law.
 
 IV.
 
 22
 Bell next argues that he was entitled to an evidentiary hearing on his claim that the husband of the only African-American juror, Deborah Williams, received a threatening phone call at home during the trial, and that he told his wife (Ms. Williams) about the threat.
 
 
 23
 The state PCR court permitted Bell to take discovery on this claim as well. Bell again bases his claim on the allegations of alternate juror Bobbie Sue Smith, who testified that Deborah Williams called home to her husband who said there had been some phone calls to their home. Ms. Smith did not "remember [Ms. Williams'] mentioning specifics about what they said, or what they were going to do to them or anything of that nature. She indicated that they were threats." Ms. Smith testified that Ms. Williams looked shaken, surprised, and frightened. She further testified that three other jurors heard Ms. Williams discuss the phone calls to her home.
 
 
 24
 The parties also deposed the juror, Ms. Williams, who directly contradicted Ms. Smith's testimony. Ms. Williams testified that, although she received a phone call from her husband, she did not tell the other jurors about it; rather she only reported it to one of the SLED officers guarding the jury. Moreover, she described the call as follows: "All I told him [the SLED officer] was that somebody called asking was I there, and that was it, you know. I guess he wrote it down. That was all there was to it. It was nothing to it." Her husband "didn't seem to be concerned about it, because they didn't say anything." Her husband "didn't get any threatening phone calls" and she "never received any threats whatsoever." According to Ms. Williams, the caller also did not mention the Bell case. Finally, Ms. Williams testified that nothing happened during the trial that made her feel pressured or coerced as a juror.
 
 
 25
 After reviewing the depositions, the state PCR court refused to permit additional testimony because "there ha[d] been no suggestion" that Ms. Williams "actually felt threatened or coerced to the point that it affected her deliberations." In its final written order, the state PCR court reiterated that this claim was without merit because it was "refuted by the deposition testimony of this juror." We must "presume[]" that the state court correctly determines factual issues. See 28 U.S.C.A. § 2254(e)(1). Bell has the "burden of rebutting the presumption of correctness by clear and convincing evidence." Id. He has not carried that burden in this case given Ms. Williams' sworn deposition testimony that her husband did not receive "any threatening phone calls," that the caller merely asked if she was home and did not mention the Bell case, and that she did not feel coerced or pressured in any way during the trial. In the light of this record and the state court's factual findings, the state PCR court did not err in denying Bell an evidentiary hearing.
 
 V.
 
 26
 Bell, an African-American, also argues that he is entitled to relief under McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), because the state solicitor's decision to seek the death penalty rested on racial animus. Bell bases this claim on a study conducted for the defense by Professor Theodore Eisenberg, who examined the solicitor's patterns of seeking the death penalty where "the defendant [was] black and the victim was white, versus cases where both the defendant and victim were black." Brief of Appellant at 46.
 
 A.
 
 27
 At the outset of the McCleskey Court's Fourteenth Amendment analysis, it noted that "to prevail under the Equal Protection Clause, McCleskey must prove that the decisionmakers in his case acted with discriminatory purpose." Id. at 292, 107 S.Ct. 1756 (emphasis in original). The Court acknowledged that it "ha[d] accepted statistics as proof of intent to discriminate in certain limited contexts," such as venire-selection and Title VII cases. Id. at 293, 107 S.Ct. 1756. However, it distinguished capital sentencing decisions on a number of grounds, including the fact that "[e]ach jury is unique in its composition," that any decision to impose the death penalty "[r]ests on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense," and that, whereas in venire-selection and Title VII contexts, "the decision-maker has an opportunity to explain the statistical disparity," in the capital sentencing context, the State has no "practical opportunity to rebut" such studies given the prohibitions against questioning jurors on the motives and influences that led to their verdict. Id. at 294-96, 107 S.Ct. 1756 (citations omitted).
 
 
 28
 In capital sentencing cases, moreover, the "policy considerations behind a prosecutor's traditionally wide discretion suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties, often years after they were made." Id. at 296, 107 S.Ct. 1756 (internal quotation marks, footnotes, and citation omitted). Thus, "absent far stronger proof," the Court held that "it is unnecessary to seek such a rebuttal, because a legitimate and unchallenged explanation for the decision is apparent from the record: McCleskey committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty." Id. at 296-97, 107 S.Ct. 1756 (footnote omitted). In conclusion, the Court held that "[b]ecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." Id. at 297, 107 S.Ct. 1756.
 
 
 29
 In McCleskey, 481 U.S. at 292 n. 9, 107 S.Ct. 1756, the Court also cited with approval our decision in Shaw v. Martin, 733 F.2d 304 (4th Cir.1984). There, the habeas petitioner argued, based on a study, that South Carolina prosecutors were more likely to seek the death penalty if a defendant had killed a white victim than if he had killed an African-American victim. Shaw, 733 F.2d at 311-12. We found the study flawed because it: (1) included cases in which the prosecutor had no discretion to seek the death penalty; (2) did not adequately compare murders of similar atrocity; and (3) failed to take into account many other factors entering prosecutorial discretion, such as the willingness of the defendant to plead guilty or whether the prosecutor has sufficient evidence to prove a defendant guilty. Id. at 312-13. We held that the proffered evidence "would not have been of sufficient probative value on the issue of discriminatory intent to have required response," and, thus, "no evidentiary hearing was ... required." Id. at 313 (citation omitted).
 
 
 30
 With these principles in mind, we turn to Bell's contention.
 
 B.
 
 31
 Bell argues, based on Professor Eisenberg's study, that race was a significant factor in the prosecution of homicide cases by George Ducworth, the solicitor who chose to seek the death penalty against Bell. Brief of Appellant at 44-45. Bell asserts that the study "exposed significant disparity in the prosecutor's decision to seek the death penalty where the defendant is black and the victim was white, versus cases where both the defendant and victim were black." Id. at 46. Thus, "based on the compelling statistical evidence and the facts of this case, the illegitimate factor of race infected the prosecutor's decision to seek the death penalty against [Bell], in violation of the Fourteenth Amendment." Id. at 49.
 
 
 32
 The state PCR court carefully considered Professor Eisenberg's study, in which he analyzed data compiled by researchers associated with Bell's post-conviction counsel. In an evidentiary hearing before the state PCR court, Professor Eisenberg explained that "there seems to be a correlation between race of defendant and race of victim and prosecutorial decisions to issue notices of intent to seek death in Anderson County in particular when a black defendant is charged with the murder of a white victim." Specifically, the researchers found data on eleven cases in which Anderson County prosecutors sought the death penalty from 1979-89. African-American defendants were charged with killing white victims in six cases, and the Anderson County prosecutors issued a notice of intent to seek death in four of the cases (66.7%). In the 84 other murder cases involving other racial combinations, prosecutors issued a notice in seven cases (8%).
 
 
 33
 Applying McCleskey and Shaw, inter alia, the state PCR court found the Eisenberg study flawed for a number of reasons, including: (1) the study was unable to account for the existence or lack of statutory aggravating circumstances, without which the prosecution may not seek the death penalty, and also was unable to account for the existence or lack of mitigating circumstances; (2) the study was unable to compare murders of a similar aggravating nature and to consider other factors pertinent to the decision to seek the death penalty, such as the defendant's role in the murder, his prior record, his willingness to plead guilty and the sufficiency of the evidence; and (3) the study included 1979 and 1980 cases, although Ducworth was not elected until 1981.
 
 
 34
 The court further concluded that Ducworth, like the prosecutor in McCleskey, had a legitimate reason for seeking the death penalty, namely that Bell committed a crime that permitted the death penalty under the United States Constitution and South Carolina law. Finally, the PCR court held that, even if Bell had made a prima facie showing of discriminatory intent, the "solicitor's credible testimony at the post-conviction relief hearing clearly rebut[ted] any claim of discrimination." At the hearing, Ducworth explained that he sought the death penalty in Bell's case based on, inter alia: (1) the strength of the State's case; (2) the existence of aggravating circumstances; (3) the desires of the victim's family; and (4) Bell's role in the murder.
 
 
 35
 The state PCR court's application of McCleskey was not unreasonable. In McCleskey, the Court "set forth very exacting standards for entitlement to constitutional relief based on statistical evidence of race-of-defendant and race-of-victim effects." Sexton v. French, 163 F.3d 874, 888 (4th Cir.1998). The Eisenberg study, which suffers from some of the shortcomings we identified in Shaw, does not constitute "the exceptionally clear proof" demanded by McCleskey.[4] 481 U.S. at 297, 107 S.Ct. 1756; see also Sexton, 163 F.3d at 888-89. Moreover, the state PCR court reasonably considered the fact that Bell committed a crime punishable by death, McCleskey, 481 U.S. at 296-97, 107 S.Ct. 1756, and Ducworth's explanation of his reasons for seeking the death penalty in Bell's case.
 
 VI.
 
 36
 Bell next contends that the State peremptorily struck a prospective African-American juror, Katherine Galloway, for racially discriminatory reasons in violation of his equal protection rights and Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). He argues that the prosecutor's stated grounds for striking Galloway, namely her views on the death penalty, constituted pretext given similar responses of seated white jurors.
 
 A.
 
 37
 When a party raises a Batson challenge, "the trial court must conduct a three-part inquiry." Matthews v. Evatt, 105 F.3d 907, 917 (4th Cir.1997). First, the defendant "must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." Hernandez v. New York, 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion) (citing Batson, 476 U.S. at 96-98, 106 S.Ct. 1712). Second, if a prima facie case of discrimination is made, "the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question." Id. at 358-59, 111 S.Ct. 1859. Third, the trial court "must determine whether the defendant has carried his burden of proving purposeful discrimination." Id. at 359, 111 S.Ct. 1859.
 
 
 38
 At Bell's trial, the prosecutor had five peremptory strikes and used four of them, three against African-American jurors (including one alternate) and one against a white juror. The jury had one African-American member. During voir dire, the court and the attorneys engaged in the following colloquy with Ms. Galloway on the death penalty:
 
 
 39
 Court: Are you in favor of the death penalty, opposed to it or just where do you sit?
 
 
 40
 A: I — I believe in our legal system, and I feel when everything is brought to the court and presented to the court, I do believe in the jury selection, well, choosing a verdict. I don't really — can't say yes or no.
 
 
 41
 Court: You're going to have to come pretty close to it.
 
 
 42
 A: Do I have to?
 
 
 43
 Q: Well —
 
 
 44
 A: I believe it's wrong for someone to take somebody else's life.
 
 
 45
 Q: Well, could you, however — could you, just answer, not in this case, but if the facts were bad enough, could you return a death penalty?
 
 
 46
 A: If all the evidence pointed to that person, I believe I could.
 
 
 47
 ...
 
 
 48
 A: I think it would be kind of difficult [to sign a death verdict], but I — if I — if that's what we chose as a verdict[.]
 
 
 49
 Prosecutor: Could you sign your name to a death penalty?
 
 
 50
 A: If that was the decision that all of us made that's involved.
 
 
 51
 ...
 
 
 52
 Prosecutor: Would the fact that the defendant might be about the same age as some of your [eight] children might make it more difficult for you to vote for the death penalty?
 
 
 53
 A: That's hard to say. I don't — I, of course, think that I have a child that age. I sound ruthless when I say, but this is something that needs to be decided upon, and if I have been chose as a juror, I would do my best with everybody else to be fair, and I would sign.
 
 
 54
 After the trial court qualified Ms. Galloway, the prosecutor used a peremptory strike; Bell then raised a Batson objection. Without making a prima facie finding, the trial court, at Bell's request, allowed the prosecutor to make a record of his explanation. The prosecutor stated:
 
 
 55
 The reason for the State excluding this particular juror is that she appeared to be very weak on the death penalty. She stated that she believes in our legal system, but she initially said I can't really say she believes in the death penalty. Then after a good bit more questioning she finally said she could return a death penalty, but she seemed to be very reluctant in that — in saying that, and also the fact that she has several children about the same age as this Defendant is another reason the State feels that she would have a very difficult time returning the death penalty.
 
 
 56
 In an apparent later ruling on the Batson motion, the trial court stated that the prosecutor gave a "satisfactory" reason for striking Ms. Galloway.[5]
 
 B.
 
 57
 Bell contends that the prosecutor did not strike three white jurors (jurors Gast, Kaiser, and Richey) with assertedly similar views on the death penalty, and, therefore, the prosecutor's reasons for striking Ms. Galloway were pretextual. The Supreme Court recently commented on a similar contention, noting that while it did not need to resolve the question, evidence of "a comparative juror analysis" indicating "the prosecutors' rationales to have been pretexts for discrimination ... does make debatable the District Court's conclusion that no purposeful discrimination occurred." Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 1043, 154 L.Ed.2d 931 (2003) (emphasis added). Thus, comparative juror analysis clearly is a relevant consideration in the Batson analysis; nevertheless, "[b]oth the prosecutor and defense counsel must be allowed to make credibility determinations when exercising peremptory challenges." Howard v. Moore, 131 F.3d 399, 408 (4th Cir.1997) (en banc).
 
 
 58
 As an initial matter, we believe that, of the three white jurors identified by Bell, only one, juror Gast, expressed views on the death penalty sufficiently similar to those of Ms. Galloway to form the basis for a Batson challenge.[6] See id. (comparing similarity of anti-death penalty sentiments); Matthews, 105 F.3d at 918. Juror Gast variously stated that "[p]ersonally I feel if somebody admits to a crime that they have murdered somebody, then I feel like the death penalty is in order[,]" "[e]ven if we have all of this evidence and, you know, eleven other people in that room says, you know, yes, the death penalty on that, you know, I look at it I'm the last vote, hypothetical situation, would I be able to say, you know, put my vote in and say yes. To me it's like playing God in some cases. I don't know. I've never been in that position. I don't know what I would do[,]" and that she could "possibly" "return a verdict of death along with the eleven other jurors[.]"
 
 
 59
 On direct appeal, the Supreme Court of South Carolina, over a dissent by Justice Finney, held that "[v]acillating responses to voir dire questions regarding the death penalty will support the use of a peremptory strike against a Batson challenge," and noted that the court had "repeatedly declined to substitute its judgment for that of the Solicitor regarding subjective responses to death penalty voir dire questions in the face of claims comparable white jurors were seated." Bell, 406 S.E.2d at 168 (citations omitted). Thus, the court apparently viewed comparison of the death penalty answers of white and African-American jurors as irrelevant to the purposeful discrimination analysis required under Batson. The Supreme Court has made it clear that such a view is erroneous. See, e.g., Miller-El, 123 S.Ct. at 1043. We cannot conclude, however, that the state court's application of Batson was ultimately unreasonable.
 
 
 60
 The Supreme Court of South Carolina further explained its rejection of the Batson argument, reasoning that "[s]eated jurors with children appellant's age did not vacillate regarding the death penalty." Bell, 406 S.E.2d at 168. This conclusion is not unreasonable. The prosecutor stated that he struck Ms. Galloway both because of her death penalty responses and his concern regarding the similarity in ages between her children and Bell.[7] Although juror Gast had similar death penalty responses, Bell does not contend that she had children of similar age to Bell. Thus, Ms. Galloway and juror Gast were "not similarly situated," Matthews, 105 F.3d at 918.[8]
 
 VII.
 
 61
 Bell contends that his trial counsel was ineffective because counsel did not request, as state law then permitted, that the court instruct the jury that a sentence of life imprisonment would require Bell to serve thirty years in prison before being eligible for parole.
 
 
 62
 On direct appeal to the Supreme Court of South Carolina, Bell "claim[ed] that since the record contain [ed] no waiver of his `right' to have parole eligibility charged under State v. Atkins, 293 S.C. 294, 360 S.E.2d 302 (1987), the trial judge erred in failing to give the charge." Bell, 406 S.E.2d at 171. The Supreme Court rejected Bell's argument, explaining: "In Atkins, this Court held a capital defendant... may request that the jury be charged regarding parole eligibility. There is no requirement this charge be given absent a request and it is the defendant's burden to show a request was made." Id. (emphasis in original).
 
 
 63
 The state PCR court treated Bell's Atkins claim, in part, as one of ineffective assistance of counsel.[9] It found neither deficient performance nor prejudice:
 
 
 64
 [I]t is clear Applicant has not shown any prejudice resulting from trial counsel's failure to request a jury charge on Applicant's parole eligibility under then-existing law, i.e., Atkins. The mere fact that he had the right to request such an instruction is not determinative. "To hold otherwise would grant [Applicant] a windfall to which [he is] not entitled." Lockhart v. Fretwell, 506 U.S. 364, 366, 113 S.Ct. 838, 841, 122 L.Ed.2d 180 (1993).
 
 
 65
 To prove ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Bell must first demonstrate that his "counsel's performance was deficient." Id. at 687, 104 S.Ct. 2052. As the Court elaborated, "[t]his requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed [a] defendant by the Sixth Amendment." Id. Our review of counsel's performance is "highly deferential[;]" that is, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689, 104 S.Ct. 2052 (internal quotation marks and citation omitted). Bell must also "show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687, 104 S.Ct. 2052.
 
 
 66
 We do not believe the state PCR court was unreasonable in finding neither deficient performance nor prejudice in trial counsel's failure to request a parole eligibility instruction under Atkins. First, trial counsel could certainly have made a strategic decision not to request an instruction telling the jury that Bell would be eligible for parole in thirty years if the jury recommended life imprisonment. For, as the Supreme Court has recognized, "[i]n a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative." Simmons, 512 U.S. at 168, 114 S.Ct. 2187 (plurality opinion). Trial counsel could certainly have been concerned that telling jurors that Bell could be out on the street in thirty years would dissuade them from recommending "life" imprisonment. Thus, the state PCR court reasonably found no deficient performance.[10]
 
 
 67
 Second, the state PCR court's application of Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), to the prejudice question was not unreasonable. Fretwell was convicted of capital felony murder based on the aggravating factor of murder committed for pecuniary gain, which duplicated an element of the underlying felony. 506 U.S. at 366, 113 S.Ct. 838. Prior to the trial, the United States Court of Appeals for the Eighth Circuit had held such double counting impermissible. Id. at 367, 113 S.Ct. 838. Fretwell's attorney did not make such an objection at trial. Id. Before Fretwell's federal habeas claim reached the Eighth Circuit (and the Supreme Court), the case on which Fretwell relied had been overruled. Id. at 368, 113 S.Ct. 838.
 
 
 68
 In light of the intervening case, the Supreme Court held that a "counsel's failure to make an objection in a state criminal sentencing proceeding — an objection that would have been supported by a decision which subsequently was overruled — [does not] constitute[ ] `prejudice' within the meaning" of Strickland. Id. at 366, 113 S.Ct. 838. The Court concluded that to "hold otherwise would grant criminal defendants a windfall to which they are not entitled." Id.; see also id. at 374, 113 S.Ct. 838 (O'Connor, J., concurring).
 
 
 69
 Likewise, in this case, the Supreme Court of South Carolina had overruled Atkins seven years before the state PCR court's decision. See State v. Torrence, 305 S.C. 45, 406 S.E.2d 315, 323 (1991) (Chandler, J., concurring). Therefore, the state PCR court did not unreasonably apply Fretwell in finding no prejudice from trial counsel's failure to request a jury instruction under Atkins, which it knew to be "wholly meritless under current governing law." Fretwell, 506 U.S. at 374, 113 S.Ct. 838 (O'Connor, J., concurring).
 
 VIII.
 
 70
 For the foregoing reasons, the judgment of the district court is in all respects
 
 
 71
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 Bell also asserts that "cumulative error" requires reversal. In this cumulative error argument, the fifth in his brief, Bell advances a number of claims, with varying degrees of completeness. We have carefully reviewed the record and the parties' arguments on these claims and agree with the district court, for the reasons expressed in its well-reasoned opinion, that none of these claims merit federal habeas relief
 
 
 [2]
 In its final written order, the state PCR court further noted that the issue had been previously ruled upon by it and the Supreme Court of South Carolina in a decision arising out of a sealing orderSee Ex Parte Greenville News, 326 S.C. 1, 482 S.E.2d 556, 557 n. 1 & 558 (1997). Bell argues that we should disregard the supreme court's sealing order decision because he was not a party to that appeal. We need not reach that contention; because the state PCR court's final order (which incorporated its prior ruling) was the last reasoned opinion on the claim, we review that order. Cf. Ylst v. Nunnemaker, 501 U.S. 797, 805, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).
 
 
 [3]
 The Court has granted relief only when a defendant has proffered evidence of such "outside influence" on a jury verdictSee, e.g., Parker v. Gladden, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); Remmer v. United States, 350 U.S. 377, 381-82, 76 S.Ct. 425, 100 L.Ed. 435 (1956); see also Fullwood v. Lee, 290 F.3d 663, 676-77, 680-82 (4th Cir.2002) (remanding for evidentiary hearing in habeas case when petitioner offered evidence that a juror's husband, who was "strongly pro-death penalty," influenced his wife during the trial and deliberations by "constantly telling" her that she should convict petitioner and sentence him to death).
 
 
 [4]
 We recognize that the Eisenberg study differed in design and methodology from those at issue inMcCleskey and Shaw. While the studies in Shaw and McCleskey focused on the imposition of the death penalty state-wide, the Eisenberg study focused on decisions to seek the death penalty by the Anderson County solicitor over a period of time that included Ducworth's prosecution of Bell. See McCleskey, 481 U.S. at 286, 107 S.Ct. 1756; Shaw, 733 F.2d at 311. Despite such differences, however, the state PCR court was not unreasonable in its application of McCleskey: there is simply no basis in Eisenberg's correlations for concluding that Ducworth discriminated against Bell in this case, given the shortcomings of this type of statistical study, the discretion granted prosecutors in seeking the death penalty, and the rebuttal evidence provided by Ducworth.
 
 
 [5]
 Because, in response to Bell'sBatson challenge, the prosecutor "offered a racial-neutral explanation" — that is, Ms. Galloway's views on the death penalty and the similar age of her children to the defendant — "the preliminary issue of whether [Bell] established a prima facie case of discrimination is moot." Matthews, 105 F.3d at 918 (citing Hernandez, 500 U.S. at 359, 111 S.Ct. 1859); cf. United States v. Barnette, 211 F.3d 803, 812 (4th Cir.2000) (concluding that juror's views on death penalty constituted a race-neutral explanation for use of peremptory strike).
 
 
 [6]
 By way of contrast to Ms. Galloway and juror Gast, juror Kaiser straightforwardly responded "yes" when asked by the court whether she could, "if the evidence were bad enough in a case, ... return a verdict of death[.]" Similarly, juror Richey stated that he "favor[ed]" the death penalty "in certain instances, especially if something's premeditated" and he was "not strictly against it[.]"
 
 
 [7]
 Bell appears to suggest that, because Ms. Galloway was not sure if any of her children were Bell's age, the prosecutor's reason for striking her was untrue. Brief of Appellant at 49-50. During voir dire, Ms. Galloway stated that she had eight children between the ages of 12 and 28; Bell was 20 at the time of the trial. Given that the prosecutor likely knew Bell's age and that it might well be revealed at trial or in the sentencing proceeding, we do not find the prosecutor's explanation to be pretextual
 
 
 [8]
 Bell also raised hisBatson claim on state post-conviction review. The state PCR court held that the claim was barred because it was raised and ruled upon on direct appeal. In the alternative, it also found the claim without merit, considering Bell's proffered statistical evidence of a study by Dr. William Jacoby, in which he found that strike patterns in Solicitor Ducworth's office showed higher rates for prospective African-American jurors than for white jurors. The state PCR court was not unreasonable in holding that "[a]t most this testimony would have helped [Bell] present a prima facie case under Batson," but that the prosecution could rebut that evidence by establishing racially "neutral reasons for striking the black jurors in Bell's trial itself." The prosecutor did exactly that in this case.
 
 
 [9]
 The state PCR court also rejected any entitlement to a jury instruction, underSimmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), which provides that "[w]here the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury — by either argument or instruction — that he is parole ineligible." 512 U.S. at 177, 114 S.Ct. 2187 (O'Connor, J., concurring in the judgment). Bell disavows any reliance on Simmons before us. Reply Brief at 22, 28.
 
 
 [10]
 The state PCR court also held inadmissible, under South Carolina Rule of Evidence 606(b), supra at 236, an affidavit from a defense investigator in which she alleged that jurors told her in post-verdict interviews that they believed Bell would be "back on the streets in a few years if they sentenced him to life." The state court's exclusion of this evidence was not contrary to clearly established federal lawSee supra at 237-238. Moreover, despite Bell's contention to the contrary, Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000), did not hold that such "[e]vidence from jurors is proper under these circumstances." Reply Brief at 26.