<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 09-4932**

———————————

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JOHN C. SHARP,

        Defendant - Appellant.

———————————

Appeal from the United States District Court for the Northern District of West Virginia, at Elkins. Irene M. Keeley, District Judge. (2:07-cr-00019-IMK-JSK-1)

———————————

Argued: September 22, 2010       Decided: November 5, 2010

———————————

Before AGEE, Circuit Judge, HAMILTON, Senior Circuit Judge, and James C. DEVER III, United States District Judge for the Eastern District of North Carolina, sitting by designation.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** Paul Harris, Wheeling, West Virginia, for Appellant. Alan McGonigal, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee. **ON BRIEF:** Joseph M. Spivey, Lexington, Virginia; Joseph A. Wallace, Elkins, West Virginia, for Appellant. Betsy C. Jividen, Acting United States Attorney, Charleston, West Virginia, Randolph J. Bernard, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Dr. John C. Sharp ("Sharp") appeals his convictions upon twenty-nine counts of health care fraud, in violation of 18 U.S.C. § 1347. On appeal, Sharp alleges numerous errors, which this Court has construed[1] as including, but not limited to: that the district court abused its discretion by allowing certain statistical evidence at trial and by allowing testimony from a non-physician medical billing and coding expert, that Sharp was deprived of his right to testify on his own behalf, prosecutorial misconduct, that certain counts in the indictment were time-barred, and that § 1347 was inapplicable. For the following reasons, we affirm the district court's judgment.

---

[1] Recounting the issues on appeal has proven challenging, as the arguments are difficult to discern from Sharp's briefs. Sharp has also violated Federal Rule of Appellate Procedure 28(a)(9)(B) by failing to include an applicable standard of review for any of the issues he raises. However, we note that during oral argument counsel conceded that the Government's proposed standards of review are accurate.

Although Sharp failed to satisfy the mandates of Rule 28, which in many instances may result in dismissal of the appeal, see, e.g., Harrelson v. Lewis, 418 F.2d 246, 247 (4th Cir. 1969), this Court has a "measure of discretion . . . whereunder it may consider an appellant's claim of error, even despite its inadequate assertion, especially when the pertinent record appears fully to be before the court, and the controverted questions have actually been argued." Indemnity Ins. Co. of N. Am. v. Pioneer Value Sav. Bank, 343 F.2d 634, 643 (8th Cir. 1965). We exercise that discretion in this case with the admonition to Sharp's counsel that they should take greater care in future appeals.

I.

Sharp was a doctor of osteopathic medicine and licensed to practice in the state of West Virginia. He operated a general family practice medical clinic under the name Pocahontas Medical Clinics ("PMC").

Sharp was enrolled as a provider with Medicare, Medicaid, and the West Virginia Workers' Compensation Program ("WVWC"). These third party payers pay claims using a national billing coding practice based on the Physicians' Current Procedural Terminology ("CPT") system, which is published in the AMA Current Procedural Terminology Manual ("CPT Manual"). The CPT Manual provides codes for each of the services provided to the program's beneficiaries by the provider, with descriptions of each. The codes are meant to account for the length of the doctor's visit with the patient, the complexity involved in the medical decision making, and the patient's medical history.

Each of the counts against Sharp charged that he knowingly and fraudulently misused the billing codes. The charges represent three general schemes: (1) the fraudulent misuse of so-called "prolonged services" codes, which are codes that are used for a visit that requires face-to-face time with the patient that is longer than the typical time spent rendering that type of procedure or service; (2) "upcoding," or submitting

4

claims for a "higher" level service than the one actually rendered; and (3) billing for services not rendered.

During trial, the Government called two expert witnesses whose testimonies are relevant to this appeal. The first was Betty Stump ("Stump"), a medical coding and billing expert. In sum, Stump testified that she reviewed the office visit progress notes maintained by Sharp and determined that Sharp's billings were not supported by the documentation. The Government also called Dr. Klaus Miescke ("Miescke"), a statistician. Because Sharp submitted over 15,000 claims to the third party payers during the relevant time period, the Government asked Miescke to "select a statistically valid random sample" of the claims to determine the estimated total amount of loss to Medicare and Medicaid. (Appellee's Br. 11).

At the conclusion of trial, the jury returned a verdict convicting Sharp on all counts, and he was sentenced to 36 months' imprisonment.

Sharp moved for a new trial, or in the alternative, for a judgment of acquittal, alleging multiple errors which included ineffective assistance of counsel, that certain counts of the superseding indictment were time-barred, prosecutorial misconduct, that 18 U.S.C. § 1347 was inapplicable to worker's compensation programs, that the district court erred by allowing Miescke's and Stump's testimonies, insufficiency of the

5

evidence, that the district court erred by not including a proposed jury instruction, and challenges to several trial rulings. After holding a post-trial hearing, the district court denied Sharp's motion in a written order.

Sharp noted a timely appeal, and this Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

A.

Sharp argues that the district court erred by allowing certain expert testimony at trial; namely, that Miescke's use of statistical extrapolation to estimate loss was allowed in error, and that Stump's testimony was allowed in error because she is not a physician.[2]

This Court reviews a district court's evidentiary rulings, including rulings on the admissibility of expert testimony, for abuse of discretion. Gen. Elec. Co. v. Joiner, 522 U.S. 136,

___

[2] In his brief, Sharp originally frames these issues as alleging that the "Government failed to meet its burden by not providing expert testimony from a physician," (Appellant's Br. 1), and that "[i]ntroduction of evidence contained in paragraphs 10, 11 and 12 of the Superseding Indictment were unduly prejudicial because statistical evidence is not appropriate at trial." (Appellant's Br. 2). We have reframed the issues in an attempt to make sense of Sharp's convoluted opening brief while endeavoring to sufficiently address the substance of his claims.

6

141-42 (1997). "The question of whether expert testimony is admissible is within the sound discretion of the trial judge, and appellate courts normally defer to the trial judge's decision." Persinger v. Norfolk & W. Ry. Co., 920 F.2d 1185, 1187 (4th Cir. 1990).

1.

Before trial, Sharp moved to exclude Miescke's testimony, arguing during a pre-trial Daubert hearing that "it is inappropriate at the count phase for there to be extrapolation testimony that goes to the amount of the loss. . . . [T]hat is a sentencing issue, if we ever get there . . . ." (J.A. 422). The district court considered the issue and decided to allow the testimony.

Sharp raised the issue again in his motion for a new trial or for acquittal. The district court held that, "[a]fter weighing the parties' arguments, [the district court] has no trouble concluding that Dr. Miescke's statistical testimony was properly admitted, . . . and survives the defendant's challenge under Federal Rule of Evidence 403 because its probative value substantially outweighed any unfair prejudice to the defendant." (J.A. 323).

Although Miescke's statistical evidence would also have been appropriate during the sentencing phase of the trial, we

find that the district court did not abuse its discretion by allowing the testimony during trial. See United States v. Rosin, 263 Fed. Appx. 16, 21 (11th Cir. 2008) (unpublished) (mentioning the use of similar testimony during trial). First, we note that Miescke "provide[d] a valid foundation" for his conclusions by explaining how he reviewed the claims, the statistical methods he used, and how he arrived at his proposed estimate of loss. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 200 (4th Cir. 2001); see Fed. R. Evid. 702. Indeed, Sharp does not contest Miescke validly qualified as an expert witness nor does Sharp contend Miescke applied statistically invalid methods.[3]

Furthermore, Miescke's testimony was relevant pursuant to Federal Rule of Evidence 402; it gave the jury context as to the extent of the alleged loss, and conducting testimony as to approximately 15,000 claims of fraud would have been overly burdensome. Nor was the testimony improperly prejudicial pursuant to Federal Rule of Evidence 403, particularly considering that there was overwhelming evidence of guilt as to each count. More importantly, Miescke never opined as to Sharp's actual guilt or the existence of fraud. See United

---

[3] In fact, during the Daubert hearing defense counsel agreed that "[w]e don't have a problem conducting the cross-examination at this stage with the statistician coming forward and saying this is what I did; this is how I arrived at this random sample . . . ." (J.A. 423).

States v. Sdoulam, 398 F.3d 981, 990 (8th Cir. 2005) ("[The expert statistician] made no statement regarding the mathematical probability that [the defendant] was guilty of the crimes charged.").

Moreover, we can analogize Miescke's testimony to the methods used to determine total drug amounts in drug trafficking cases, which, while often conducted during the sentencing phase, have at times been testified to during trial. See, e.g., United States v. Tran, 519 F.3d 98, 106 (2d Cir. 2008); Sdoulam, 398 F.3d at 989-90; United States v. Royal, 87 Fed. Appx. 892, 894 (4th Cir. 2004) (unpublished); United States v. Maceo, 873 F.2d 1, 6-7 (1st Cir. 1989).

Finally, defense counsel had the opportunity to cross-examine Miescke and thus was able to challenge Miescke's method of analysis or his conclusions. Ultimately, it is the role of the jury to arrive at its own conclusions as to the credibility of the experts and the weight to give their testimony. See Maceo, 873 F.2d at 7 ("It is the jury's role to determine the credibility of witnesses and the weight to accord their testimony. After full cross-examination, the jury had the choice whether to trust the testimony presented."). On balance, the district court's ruling was thus an appropriate exercise of its discretion.

2.

Sharp also moved to exclude Stump's proposed testimony, arguing during the Daubert hearing that, although "[s]he can make a judgment as to whether or not the documentation supports" the code used, (J.A. 508), "she cannot render an opinion as to whether or not a particular medical decision should have been labeled low, moderate, high in terms of complexity . . . . Only a physician can determine that." (J.A. 506).  The district court denied the motion, finding that

> a coding expert, such as Ms. Stump, routinely determines whether services billed by a provider are appropriately coded and if a provider documents a certain level of medical decision making, then the documentation is factored into the coding and billing decisions and I don't believe that this testimony will confuse the jury.  I think it will be helpful to the jury.

(J.A. 510).

Sharp raised the issue a second time in his motion for a new trial or for acquittal.  In the district court's order denying the motion, the court found that

> [t]he issues in this case did not involve questions of medical necessity, but rather alleged that Dr. Sharp had submitted claims for payment for services he had never rendered, or had sought reimbursement for higher levels of service than he had actually provided.  In similar health care fraud cases, coding experts have routinely testified about whether services a provider billed were appropriate. . . .
> Because this case did not raise issues of medical necessity or any other clinical issue requiring a physician's testimony, and because the use of a coding expert was appropriate, . . . the Court rejects

10

> Sharp's contention that the government was required to provide expert physician testimony to prove health care fraud . . . .

(J.A. 325-26).

On appeal, Sharp reiterates this argument. In support, Sharp cites several cases from other courts of appeals which he contends stand for the proposition that physician testimony is necessary to prove coding or billing fraud, including United States v. Wexler, 522 F.3d 194 (2d Cir. 2008), United States v. Bek, 493 F.3d 790 (7th Cir. 2007), and others. However, these cases are clearly distinguishable from the case at bar.

The Second Circuit held in Wexler, a distribution of controlled substances and health care fraud case, that the expert testimony of a physician expert "regarding the standard of care . . . was properly received by the District Court as relevant to the question of Wexler's good faith in prescribing the controlled substances that were the subject of the indictment." Wexler, 522 F.3d at 204 (emphasis added). In Bek, another case dealing with the distribution of controlled substances and health care fraud, the Seventh Circuit held that the jury could not assess whether Bek's treatment of a patient was "within the normal course of professional practice" without medical records or expert testimony as to the patient's "condition or Bek's treatment of her." 493 F.3d at 799 (internal quotations omitted).

11

However, in the case at bar neither clinical decision making nor appropriate standards of care were at issue. Instead, the question was whether Sharp knowingly used incorrect codes for the services he claimed he provided. As Stump testified,

> as a coder or an auditor I'm not making any decisions about the treatment plan for the patient; I'm just looking to see what did the doctor document; what did he write down that the patient's problem is; what did he write down that his treatment plan is going to be. What did he write down about when he wants to see the patient back. What did he write down about possible risks to the patient. I don't question what the medical plan was; I simply evaluate it to determine where it falls in the scope of severity for assigning a code.

(J.A. 1163). Medical billing and coding experts have been used for this purpose without dispute in the Fourth Circuit. See, e.g., United States v. Janati, 374 F.3d 263, 271-72 (4th Cir. 2004) (noting that medical coding experts are used "to determine whether . . . documentation supports . . . billings under [the] CPT").

Finally, we observe that during cross-examination defense counsel questioned Stump about her status as a "coder" who is "not [a] clinician[] [and that] determinations regarding the propriety of medical decision making or a patient's clinical severity are omitted from the coding process." (J.A. 1625). Stump concurred that she does "not make clinical decisions" and agreed with defense counsel's statement that she is "not [a]

12

clinician[]." (J.A. 1626). Thus, the argument Sharp makes here was before the jury and the jury properly performed its duty to "weigh the evidence and the credibility of each expert." Mosser v. Fruehauf Corp., 940 F.2d 77, 83 (4th Cir. 1991) (internal quotations omitted).

Consequently, as the district court appropriately found, "all the cases Sharp cites to support his argument that the government must present physician expert testimony involved disputed questions of 'medical necessity.' By their nature, these are clinical cases which, unlike the instant case, do require the testimony of an expert health care provider." (J.A. 326). Thus, the district court did not abuse its discretion in permitting Stump's testimony.


B.

Sharp next alleges that he was deprived of his right to testify on his own behalf, either as a result of ineffective assistance on the part of his counsel, or due to the district court's failure to sua sponte conduct an on the record colloquy with Sharp to obtain a waiver of his right to testify.

At a post-trial hearing, Sharp testified that he had planned to take the stand during trial, and that none of his lawyers "s[a]t down with [him] and [went] through an analysis . . . [of] the risk of . . . testifying, the benefit of

13

testifying, risk of not testifying, benefit of not testifying." (J.A. 3700). Although Joel Hirschhorn ("Hirschhorn"), lead trial counsel for Sharp, admitted that he was not sure whether he said the "magic words," he was sure that he had discussions with Sharp about whether he would testify, and that Sharp "concurred in [his] decision." (J.A. 3815).

The district court found that "I don't have a circumstance here where I believe I had to get an on the record waiver of the right to testify because I didn't have any language or conduct from Dr. Sharp that would indicate that he was desirous to testify and that desire was being contravened by his attorneys." (J.A. 3864). The district court also found:

> I don't think that it's credible to believe that Dr. Sharp was unaware of his lawyers' strategic opinion about the wisdom of him taking the stand.
> . . . .
> [I]t is difficult, if not impossible, for this Court to believe that a man of Dr. Sharp's experience and intellect would not have questioned why no one was preparing him for testimony the next day.
> . . . .
> Dr. Sharp had an ample opportunity between the close of the evidence . . . [and] closing arguments . . . to tell [his attorneys] that he felt he'd been denied what he had expected, which was the right to testify.
> . . . .
> So, on balance, when I weigh this evidence, there is a complete lack of support from the totality of that evidence for Dr. Sharp's recollection as to how this was handled.

(J.A. 3866-71).

14

In its order denying Sharp's motion for a new trial or for acquittal, the district court adopted these previous findings, and further found that "there was no agreement between Sharp's trial counsel and the government to deprive Sharp of his right to testify." (J.A. 310).

This Court reviews legal issues <u>de</u> <u>novo</u> and factual findings under a clear error standard. <u>United States v. Pettiford</u>, 612 F.3d 270, 275 (4th Cir. 2010).

1.

This Court construes Sharp's allegation that his trial counsel "violated West Virginia Rules of Professional Conduct" as an attempt to make an ineffective assistance of counsel argument. <u>See</u> <u>Sexton v. French</u>, 163 F.3d 874, 881 (4th Cir. 1998). However, "[t]he rule in this circuit is that a claim of ineffective assistance should be raised in a 28 U.S.C. § 2255 motion in the district court rather than on direct appeal, unless the record conclusively shows ineffective assistance." <u>United States v. Williams</u>, 977 F.2d 866, 871 (4th Cir. 1992). Because we find that it does not conclusively appear from the record that Sharp's counsel was constitutionally ineffective, this Court will not consider Sharp's ineffective assistance of counsel claim.

However, even assuming arguendo that we could consider this claim on appeal, this Court finds that the district court did not clearly err in making the well-reasoned and detailed finding that it was "not credible" that Sharp was "unaware" of his right to testify on his own behalf or of the strategic decision not to testify, and that there was a "complete lack of support from the totality of that evidence for Dr. Sharp's recollection as to how this was handled." (J.A. 3870).

2.

Sharp also urges this Court to adopt "a rule that in cases such as the one at bar, the trial court itself is required to engage in an on-the-record colloquy with defendants when they elect to rest their case without testifying," (Appellant's Br. 13), and to find that the district court failed in this new duty.

Although, of course, the right to testify on one's own behalf "is one of the rights that 'are essential to due process of law in a fair adversary process,'" Rock v. Arkansas, 483 U.S. 44, 51 (1987) (quoting Faretta v. California, 422 U.S. 806, 819 n. 15 (1975)), this Court and the majority of our sister circuits have clearly held that "[t]o waive the right [to testify], all the defendant needs to know is that a right to testify exists," and the district court need not advise the

16

defendant of the right nor obtain a waiver. United States v. McMeans, 927 F.2d 162, 163 (4th Cir. 1991); see also United States v. Richardson, 195 F.3d 192, 197-98 (4th Cir. 1999); United States v. Ortiz, 82 F.3d 1066, 1070-71 (D.C. Cir. 1996); United States v. Pennycooke, 65 F.3d 9, 11-12 (3d Cir. 1995) (holding that a "direct colloquy" may be required in "exceptional, narrowly defined circumstances"); United States v. Brimberry, 961 F.2d 1286, 1289-90 (7th Cir. 1992); Siciliano v. Vose, 834 F.2d 29, 30 (1st Cir. 1987).

The holding in McMeans has not been overruled, altered, or limited by the subsequent holding in Sexton, contrary to Sharp's suggestion. In considering the question of "who should bear the burden of ensuring that the defendant is informed of the nature and existence of the right to testify," the Sexton Court noted that the McMeans Court's holding on this point was "perhaps unwise[]." 163 F.3d at 881. Nevertheless, the Sexton Court held that "trial counsel, not the court, has the primary responsibility for advising the defendant of his right to testify," and thus "the burden of ensuring that a criminal defendant is informed of the nature and existence of the right to testify rests upon trial counsel." Id. at 882.[4]

---

[4] We note that Sharp specifically admitted at the post-trial hearing that he did know of his right to testify during the trial:

(Continued)

17

Therefore, because the holdings of <u>McMean</u> and <u>Sexton</u> are unequivocal on this issue, the question of whether this Court should adopt Sharp's proposed "new rule" is foreclosed and cannot be overruled by this panel. See <u>Mentavlos v. Anderson</u>, 249 F.3d 301, 312 n.4 (4th Cir. 2001).

C.

Sharp next makes three allegations of prosecutorial misconduct; first, that the Government elicited "false testimony" from a witness, Lois Workman ("Workman"), by instructing her to only answer questions using the responses "yes" or "no;" second, that the Government improperly misstated the evidence;[5] and third, that the Government improperly exceeded

---

> Q: Now you said that it was your understanding throughout the whole trial, from beginning to end, that you would eventually testify, is that right?
> A: That's correct, yes sir.
> Q: Okay. Why did you think that?
> A: I just knew that's a fact, that I would testify in my defense. There was never any question about it.

(J.A. 3712).

[5] Although Sharp makes the bare allegation that the Government "misstated the evidence," he makes no substantive argument in his brief supporting this proposition. Sharp has again run afoul of Federal Rule of Appellate Procedure 28, which "requires that the argument section of an appellant's opening brief must contain the appellant's contentions and the reasons for them, with citations to the authorities and parts of the (Continued)

18

the appropriate scope during its rebuttal argument by mentioning

certain "altered records."

In its order denying Sharp's motion for a new trial or for

acquittal, the district court found that Workman

> did not answer only "yes" or "no" to questions asked
> of her, but provided detailed answers throughout her
> testimony. Moreover, . . . the portions of Workman's
> testimony characterized in her affidavit as "not
> accurate" were not material to the charges against
> Sharp. Accordingly, the evidence adduced at trial and
> otherwise found in the record does not support Sharp's
> allegation that the government presented false
> testimony during his trial.

(J.A. 316).

As to the allegation that the Government exceeded the

allowable scope during its rebuttal argument, the district court

found that

> the complained-of reference to altered records by the
> government came in response to the closing argument of
> Sharp's attorney referencing a memo by John Mitchell,
> Sharp's office manager. . . . In addition, he had
> argued that fraudulent claims arose due to John
> Mitchell's advice or innocent mistakes, and that
> Sharp's honest and law-abiding nature demonstrated
> that he had not knowingly hidden anything.
> Even if the government's statements in response
> to this argument could be considered improper, they
> did not unfairly prejudice Sharp's substantive rights;
> nor do they amount to reversible error.

---

record on which the appellant relies." Wahi v. Charleston Area
Med. Ctr., Inc., 562 F.3d 599, 607 (4th Cir. 2009) (internal
quotations omitted). Thus, this Court will not consider Sharp's
argument that the prosecutor "misstated the evidence."

19

(J.A. 317-19).

This Court reviews the denial of a motion for a new trial for an abuse of discretion. United States v. Adam, 70 F.3d 776, 779 (4th Cir. 1995).

The test for prosecutorial misconduct has two components: "(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Chorman, 910 F.2d 102, 113 (4th Cir. 1990) (internal quotations omitted).

1.

Although he fails to cite it in his brief, Sharp submitted a post-trial affidavit from Workman in which she swore that a few portions of her testimony were inaccurate and that she was "told by representatives of the Government that [she] was to answer the questions with a 'yes' or 'no.'" (J.A. 289). We assume this is Sharp's support for his charge the Government presented false testimony. However, even the most cursory review of Workman's testimony proves the contrary. During cross-examination, the Government asked questions of Workman that required more than a "yes" or "no" response. Consequently,

20

many of Workman's responses were more detailed and lengthy than merely "yes" or "no."

Furthermore, even if Workman were so instructed, Sharp provides no legal authority to support his argument that requesting a witness to answer only "yes" or "no" has ever been construed by any court as improperly eliciting false testimony. Thus, there is simply no support for Sharp's brazen accusation that the Government acted improperly in questioning Workman.[6]

2.

Sharp also fails to cite to any legal authority that supports his proposition that it constitutes reversible error for the Government's rebuttal argument to reach matters beyond the scope of the defendant's reply argument.

However, even if such a rule exists, the Government's reference to altered records was in direct reply to a theory raised by the defense during closing argument and throughout the trial; namely, the argument that any discrepancies in Sharp's

---

[6] We note that Sharp makes a serious charge against the Government when he states in his brief that "the government knowingly presented false testimony during trial." However, Sharp does so without citation to the record, citation to authority, and without explanatory argument. In doing so, Sharp walks close to a line of ethical breach. We strongly caution counsel that such argument will be dealt with severely should it occur again. See Federal Rule of Appellate Procedure 46(c).

records or billing were caused by "human error mistakes, typographical errors, data entry, sloppy work, careless work" on the part of Sharp's office manager, John Mitchell ("Mitchell"), or others. (J.A. 3626). During closing, the defense specifically mentioned the so-called "Mitchell memo" which it alleged proved that Mitchell encouraged employees to alter records. The Government properly responded to the defense's theory, arguing that Sharp was actually the one altering the records because he had the most "to lose or gain." (J.A. 3665).

Consequently, this Court finds that there is no evidence that the Government engaged in any prosecutorial misconduct in this case.

### D.

Sharp next contends that, because the superseding indictment was brought after the statute of limitations expired, and because there were "significant variances" between the original indictment and the superseding indictment, certain counts in the superseding indictment are time-barred.

In its order denying Sharp's motion for a new trial, the district court held that, "because Sharp did not raise the affirmative defense of the statute of limitations at trial, he has waived that defense." (J.A. 315). Alternatively, the district court held that "there is no basis to conclude that the

22

Superseding Indictment broadened the charges in the original Indictment such that the charges in the Superseding Indictment are barred . . . ." (J.A. 315).

We need not determine whether the changes in the superseding indictment materially altered certain counts so that they did not relate back to the date of the original indictment. As the district court correctly found, because Sharp did not raise a statute of limitations defense before or during trial, he has consequently waived that defense. See United States v. Williams, 684 F.2d 296, 299 (4th Cir. 1982) ("The statute of limitations . . . is not jurisdictional. It is an affirmative defense that may be waived.").

E.

Sharp also argues that 18 U.S.C. § 1347 does not apply to state-owned and -operated workers' compensation systems, such as WVWC, because the statute "does not specifically state that it applies to state sponsored worker's compensation programs nor does the legislative history mention it." (Appellant's Br. 24).

The district court found that "Sharp cites no case law nor any portion of the relevant legislative history in support of his argument," and "state workers' compensation programs clearly fall under the express provisions of 18 U.S.C. § 1347." (J.A. 320-21).

This Court reviews issues of statutory construction <u>de novo</u>. <u>United States v. Linney</u>, 134 F.3d 274, 282 (4th Cir. 1998).

Sharp's argument is wholly without merit. The term "healthcare benefit program," as used in § 1347, is defined as

> [A]ny public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

18 U.S.C. § 24(b). Therefore, based on the clear language of the statute, WVWC plainly falls under the express definition of "healthcare benefit program." <u>See, e.g.</u>, <u>United States v. Lucien</u>, 347 F.3d 45, 52 (2d Cir. 2003).

F.

As to Sharp's remaining claims, we have carefully reviewed all of these claims, the record, and the parties' arguments and find that the district court, for the reasons expressed in its well-reasoned order denying Sharp's motion for a new trial or for acquittal, properly denied relief.[7]

---

[7] As to Sharp's claim that the district court erred during sentencing, we find that, because Sharp failed to order a transcript of the sentencing hearing, he has waived this issue on appeal. <u>See</u> <u>Keller v. Prince George's County</u>, 827 F.2d 952, 954 n.1 (4th Cir. 1987).

III.

For the foregoing reasons, the district court's judgments are affirmed.

AFFIRMED